**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **TERRI SCONFIENZA,** | : | |
| **Plaintiff** | : | **CIVIL ACTION NO. 3:05-0272** |
| **v.** | : | **(MUNLEY, D.J.)** |
| | | **(MANNION, M.J.)** |
| **VERIZON PENNSYLVANIA,** | : | |
| **INC., d/b/a VERIZON, & LESLEE** | | |
| **SPARROW,** | : | |
| **Defendants** | : | |

## REPORT AND RECOMMENDATION

Before the court is the defendants' motion for summary judgment. For the following reasons, the court recommends that the motion be granted and the plaintiff's complaint be dismissed.

## I.   Procedural History

The plaintiff commenced this action on February 8, 2005, by filing her complaint, raising allegations against the defendants under the Family Medical Leave Act of 1993 ("FMLA"), 29 U.S.C. § 2601 et seq. (2006), the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. § 12101 et seq. (2006), and the Pennsylvania Human Relations Act of 1955, 43 PA. CON. STAT. ANN. § 955 (West 2006).[1] (Doc. No. 1.) The plaintiff's complaint consists

---

[1]The "analysis of an ADA claim applies equally to a PHRA claim." Taylor v. Phoenixville Sch. Dist., 184 F.3d 296, 306 (3d Cir. 1999) (citing Kelly v. Drexel Univ., 94 F.3d 102, 105 (3d Cir. 1996)). Therefore, the court, as the parties have done, will consider both claims together except as to the plaintiff's allegations that defendant Sparrow aided and abetted defendant Verizon in violation of the PHRA. Cf. Williams v. Philadelphia Hous. Auth.

of four counts. First, as against defendant Verizon, the plaintiff claims that the defendants discriminated against and harassed her on the basis on her disability, retaliated against her for the exercise of her rights under the ADA, and failed to accommodate her disability, all in violation of the ADA. Second, as against defendant Verizon, the plaintiff raises the allegations in count one under the PHRA.  Third, as against defendant Sparrow, the plaintiff raises the allegations in count one under the PHRA on the ground that defendant Sparrow aided and abetted defendant Verizon in depriving the plaintiff of her ADA rights. Finally, as against defendant Verizon, the plaintiff claims that the defendants interfered with and retaliated against her because of the exercise of her rights under the FMLA. On all counts, the plaintiff seeks the following relief:

> back pay, front pay, punitive damages, emotional distress, embarrassment, humiliation, attorney fees, costs, expenses, pre- and post judgment interest, delay damages, letters of good reference, reformation of Plaintiff's employment records, employment benefits, and other such legal and equitable relief as allowed at law.

(Doc. No. 1.)  The defendants answered the complaint on March 16, 2005. (Doc. No. 6).

On April 28, 2006, the defendants moved for summary judgment, submitting a statement of facts with the motion. (Doc. No. 67.) They submitted a brief in support of the motion on May 12, 2006.  (Doc. No. 65.) On May 29,

Police Dep't, 380 F.3d 751, 761 n.6 (3d Cir. 2004).

2006, the plaintiff filed a brief in opposition to the defendants' motion and an answer to their statement of facts.  (Doc. Nos. 71 & 72.)  On June 19, 2006 the defendants filed a reply brief.  (Doc. No. 75.)  On June 28, 2006 the defendants asked the court whether the parties should brief the effect, if any, of the Supreme Court's recent decision in <u>Burlington Northern & Santa Fe Railway Co. v. White</u>, – U.S. –, 126 S.Ct. 2405, 2412-14 (2006), on the plaintiff's retaliation claims.  (Doc. No. 76.)  The court ordered both parties to brief the issue (Doc. No. 77), which they did on July 21, 2006. (Doc. Nos. 78 & 79.)

In their motion, the defendants raise seven arguments. First, they contend that they did not interfere with the plaintiff's FMLA rights because they did not improperly deny the plaintiff's requests for intermittent FMLA leave, their certification requirements did not violate the FMLA, and the plaintiff suffered no economic loss as a result of being charged with non-FMLA absences.  They also note that the plaintiff seeks emotional damages, which are not allowed under the FMLA. Second, they contend that the plaintiff cannot establish a <u>prima</u> <u>facie</u> case of retaliation in violation of the FMLA because she suffered no adverse action. Third, the defendants contend that the plaintiff cannot establish a <u>prima</u> <u>facie</u> case of discrimination under the ADA because she was not disabled as defined by the ADA and suffered no adverse employment decision. Fourth, the defendants contend that the plaintiff cannot establish a <u>prima</u> <u>facie</u> case of the defendants' failing to

accommodate her disability because the allegedly sought accommodation is coincident with the entitlements she received under the FMLA and, thus, fails for the same reasons as the FMLA claim. Fifth, the defendants contend that the plaintiff cannot establish a prima facie case of harassment under the ADA because she is not disabled as defined by the ADA and did not endure an objectively hostile or abusive work environment. Sixth, the defendants contend that the plaintiff cannot establish a prima facie case of retaliation under the ADA and the PHRA because she was not engaged in a protected activity and suffered no adverse action.  Finally, the defendants contend that defendant Sparrow did not aid and abet any disability-based discrimination and 43 PA. CON. STAT. ANN. § 955(e) does not extend to "[d]irect incidents of discrimination or harassment." (Doc. No. 65 at 29.)

In opposition, the plaintiff raises seven arguments.  First, she contends that the defendants interfered with her FMLA rights by denying approved FMLA leave, harassing the plaintiff's physician into changing the FMLA certification, manipulating the FMLA process to the plaintiff's detriment, harassing the plaintiff by means of a "get-well drive-by" (Doc. No. 71 at 20), and subjecting the plaintiff to discipline for absences before determining whether they were FMLA eligible. Second, with respect to the defendants' arguments concerning FMLA and ADA discrimination and retaliation, the plaintiff contends that she, in fact, suffered economic loss, as well as an adverse employment action. She also notes that the FMLA allows for

4

equitable relief, including noneconomic loss. Third, she contends that the defendants' FMLA certification procedures interfered with her FMLA rights. Fourth, she contends that she was disabled as defined by the ADA. Fifth, she contends that the defendants failed to accommodate her disability. Sixth, she contends that she was subjected to harassment by a hostile and abusive work environment. Finally, she contends that defendant Sparrow aided and abetted defendant Verizon's discrimination within the framework of the PHRA. (Doc. No. 71.)

The motions having been fully briefed, they are ripe for disposition, and the court will consider the parties' arguments on their merits. The court has original jurisdiction over the plaintiff's Federal claims under 28 U.S.C. §1331 and pendant jurisdiction over the plaintiff's PHRA claim under 28 U.S.C. §1367.

## II.    Standard of Review

Summary judgment is appropriate when the pleadings and any supporting materials show that there are no material issues of fact to be resolved and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c); see Turner v. Schering-Plough Corp., 901 F.2d 335, 340 (3d Cir. 1990).  Federal Rule of Civil Procedure 56(c) "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the

5

existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317 (1986).  Furthermore, "Rule 56(e) . . . requires the nonmoving party to go beyond the pleadings and by [its] own affidavits, or by depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." Id. at 324; Lujan v. National Wildlife Fed'n, 497 U.S. 871, 888 (1990); Pastore v. Bell Tel. Co. of Pennsylvania, 24 F.3d 508, 511 (3d Cir. 1994) (quoting Harter v. GAF Corp., 967 F.2d 846, 852 (3d Cir. 1992)). The party moving for summary judgment bears the burden of showing the absence of a genuine issue of any material fact, but the nonmoving party must adduce more than a mere scintilla of evidence in its favor and cannot simply reassert factually unsupported allegations contained in the pleadings. Celotex Corp., 477 U.S. at 323, 325; Anderson v. Liberty Lobby, Inc., 477 U.S. 248-52 (1986); Young v. Quinlan, 960 F.2d 351, 357 (3d Cir. 1992).

To determine whether the nonmoving party has met its burden, the court must focus on both the genuineness and the materiality of the factual issues raised by the nonmovant. "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." Anderson,477 U.S. at 242, 247-48 (emphasis in original).  A dispute is genuine if the evidence would allow a reasonable jury

6

to return a verdict for the nonmoving party. <u>Anderson</u>, 477 U.S. at 250. A disputed fact is material when it could affect the outcome of the suit under the governing substantive law. <u>Anderson,</u> 477 U.S. at 248. If the court determines that "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" <u>Matsushita Elec. Indus. Co. v. Zenith Radio</u>, 475 U.S. 574, 587 (1986) (quoting <u>First Nat'l Bank of Arizona v. Cities Serv. Co.</u>, 391 U.S. 253, 289 (1968)).   All inferences, however, "should be drawn in the light most favorable to the non-moving party, and where the non-moving party's evidence contradicts the movant's, then the non-movant's must be taken as true." <u>Pastore</u>, 24 F.3d at 512 (quoting <u>Big Apple BMW, Inc. v. BMW of N. America, Inc.</u>, 974 F.2d 1358, 1363 (3d Cir. 1992)).

## III.    Factual Background

With the standard for summary judgment in mind, the court has compiled from the defendants' statement of facts and the plaintiff's counter-statement of facts (Doc. Nos. 67 & 72) and, as necessary, the evidence on which they are based, the following pertinent factual background to the case. The court has accepted as true all facts not in dispute. It has drawn any inferences in the plaintiff's favor. When the plaintiff has denied the defendants' averment, the court has examined the evidence on which the averment is purportedly based to determine if there is a basis for the plaintiff's

denial. If the evidence does not support the averment, the court has accepted the plaintiff's denial and rejected the averment in its consideration of the motion. If the evidence supports the averment, in spite of the plaintiff's denial, the court has accepted the averment in its consideration of the motion because the plaintiff has failed to meet her burden of rebutting the defendants' evidence with more than mere allegations.

Between October 2002 and December 2003, defendant Sparrow was an absence administrator for defendant Verizon, including for the plaintiff's facility. (Doc. No. 67 ¶ 31.) As an absence administrator, defendant Sparrow received calls from employees reporting their absences and then notified defendant Verizon's Absence Reporting Center ("ARC") of the employee's absences. (Doc. No. 67 ¶ 32.) ARC administered the FMLA process as relevant to this case. (Doc. Nos. 67 ¶ 33; 72 ¶ 33.)

After receiving notice of an employee's absence, ARC would mail leave-of-absence documentation to the employee's address on record to allow the employee to apply for FMLA leave. (Doc. No. 67 ¶ 35.) If the employee's absence was new, i.e., not related to previously approved FMLA intermittent leave, she would receive a medical certification form in which she could apply for a one-time leave or intermittent leave and which was to be filled out by her physician and returned to ARC within twenty-five days of the absence's first day. (Doc. No. 67 ¶¶ 36, 37, 38 & DeVito . at 24:1-8.) An employee could seek FMLA intermittent leave for up to a year and was to provide the

anticipated frequency and duration of the future intermittent absences on the medical certification form.  (Doc. Nos. 67 ¶¶ 37 & 72 ¶ 37.)

An employee's leave taken under a previously approved intermittent leave did not require a new medical certification form, but the employee would receive a personal certification form with which to certify that the absence was related to the previously approved leave. (Doc. No. 67 ¶¶ 36, 40.) Subsequent to being approved for FMLA intermittent leave, the employee was still required to notify the absence manager of any absences covered by the approved intermittent leave.  (Doc. Nos. 67 ¶¶ 39 & 72 ¶ 39.)

Employees were told to contact ARC if they did not receive the necessary forms, within five days of the beginning of their absence. (Doc. No. 67 ¶ 42.)  The ARC would deny FMLA leave for any absence for which it did not receive a certification form within twenty-five days.  (Doc. No. 67 ¶ 43.) An employee could challenge a denial by requesting, within fourteen days of the denial, an administrative review.  (Doc. No. 67 ¶ 45.)

At the time pertinent to this case, the plaintiff was subject to defendant Verizon's regional associate attendance administrative guidelines ("RAP"), which governed employee absences.  (Doc. No. 67 ¶ 46.)  Under the RAP, unexcused absences or tardiness are chargeable to an employee's record and may lead to disciplinary action.  (Doc. No. 67 ¶¶ 47, 50.)  Certified FMLA leave is not chargeable to an employee's attendance record.  (Doc. No. 67 ¶¶ 48, 53.)  As an employee with over five years' employment, the plaintiff was

9

subject to a RAP with five disciplinary steps. (Doc. No. 67 ¶ 54.) When an employee first violated the RAP, she was issued an employee discussion document indicating that she was advanced to step one in the RAP plan. (Doc. No. 67 ¶ 56.) At this step, the employee is not subject to any penalty. She remains eligible for promotions and lateral transfers and is rated as meeting requirements on evaluations. (Doc. No. 67 ¶ 57.) If no further violations occurred within six months, the employer would be reduced a step. (Doc. No. 67 ex. K at 5.) If further violations occurred, the employee would be advanced to the next step. At the third or fourth steps, the employee could be suspended. At the fifth step, the employee could be terminated. (Doc. No. 67 ¶¶ 58-70.) The defendants' supervisors apply the RAP with discretion and "in a consistent manner." (Doc .No. 67 ¶ 71.)

The plaintiff has worked for defendant Verizon since 1990 and has been a maintenance administrator at all times relevant to this case. (Doc. No. 67 ¶¶ 1-2.) For about ten years, she has suffered from migraine headaches. (Doc. No. 67 ¶ 5.) Dr. Kimberly Kovalick has treated the plaintiff since May 22, 2001, on which date she diagnosed the plaintiff with "[c]ommon migraine, without mention of intractable migraine." (Doc. Nos. 67 ¶¶ 6-7; 71, Kovalick dep. at 52:4-5.) The plaintiff's migraines occur at menstruation and times of stress. (Doc. Nos. 67 ¶ 10 & ex. B, pl. dep. at 69:16-20 ; 71, Kovalick dep. at 54:16-22; 72 ¶ 9.) The doctor's diagnosis has not changed since May 22, 2001. (Doc. No. 67 ¶ 9.)

The plaintiff was certified for FMLA intermittent leave from October 22, 2001, to October 22, 2002, because of her migraines.  (Doc. No. 67 ¶ 73.) The plaintiff submitted an FMLA certification form in September to cover intermittent leave from September 13, 2002, to September 13, 2003.  She submitted another FMLA in October to cover intermittent leave from October 22, 2002, to October 22, 2003.  Both were apparently denied.[2]  (Doc. Nos. 71, Sparrow dep. at 39:24-46:8; 72 ¶ 96.)  After that certified FMLA leave period expired, the plaintiff was absent on November 4, November 15, and December 12, 2002.  (Doc. No. 67 ¶ 74.) On November 20, 2002, the plaintiff submitted an FMLA certification form, which had been certified by Dr. Kovalich and in which the plaintiff sought to renew her FMLA intermittent leave for another year, including the November absences, for an expected frequency of six periods per month and duration of at least two days' per period.  (Doc. No. 67 ¶¶ 75, 77.)  The FMLA leave request was incomplete because Dr. Kovalick had "failed to include information regarding the treatment that Plaintiff required for her chronic health condition."  (Doc. No. 67 ¶ 76.)

On December 27, the defendants referred the plaintiff's request for intermittent certification to the ARC physician-advisor, Dr. Lewis Miller, because of an "[e]xcessive # of episodes."  (Doc. Nos. 67 ex. W; 72 at ¶ 78.)

---

[2]The record is barren of any averments addressing these requests except in the plaintiff's response to the defendants' statement of fact concerning events in early 2003 and the testimony to which she cites.

On February 20, 2003, Dr. Miller sent a fax to Dr. Kovalich asking her to review the certification form and "to clarify the treatment for [the plaintiff's] condition as well as the estimated frequency/duration of her future absences." (Doc. No. 67 ¶ 79 & ex. V.)  Shortly thereafter, Dr. Miller and Dr. Kovalich spoke.  Dr. Miller questioned the treatment Dr. Kovalich gave the plaintiff and discussed a reduction in the number of absences for which the plaintiff sought certification.  Dr. Kovalich noted in her records that Dr. Miller was "rude and demeaning" and difficult to deal with; she characterized Dr. Miller's behavior as harassing. (Doc. Nos. 67 ¶¶ 80-81, 84; 71, Kovalich dep. at 102:1-106:19, 110:6- 119:8, 128:18-130:7; 72 ¶ 79.)

On February 27, the defendants approved the plaintiff's three absences in November and December 2002, but not as intermittent leave.  (Doc. No. 67 ¶ 85 & exs. T, W.)  Dr. Miller called Dr. Kovalick "multiple times" to discuss the frequency and duration of the plaintiff's requested intermittent leave, which the plaintiff, in addition to Dr. Kovalick, characterized as harassment.  (Doc. Nos. 67 ¶ 87; 72 ¶ 87.)  Dr. Kovalick refused to take Dr. Miller's calls, with which decision the plaintiff concurred.  (Doc. Nos. 67 ¶ 87; 71, Kovalick dep. at 102: 15, 120:13-21, 123:9-124:12, 128:18-22; 72 ¶ 79.)  She also never called Dr. Miller or the defendants to discuss the situation, including to inform them that the plaintiff had told her that she did not want the frequency or duration of her requested intermittent leave changed.  (Doc. No. 71, Kovalick dep. at 121:22- 123:8, 127:13-15.)   However, neither Dr. Miller nor anyone at defendant

Verizon ever left a message for Dr. Kovalick asking her to call him.  (Doc. Nos. 71, Kovalick dep. at 184:3-14; 72 ¶ 87.)  Consequently, the defendants on March 11, 2003, denied the plaintiff's request for FMLA intermittent leave because "the information regarding intermittent absences cannot be clarified with the [health care provider].  (Doc. No. 67 ¶ 88 & ex. W at 2-3.)  But there is no indication in the record that the defendants informed the plaintiff that her FMLA intermittent leave request was denied because Dr. Kovalick would not speak with Dr. Miller or because the request form lacked complete information on the plaintiff's treatment.  (Doc. Nos. 67 ex. W at 2; 72 ¶¶ 76, 88.)  Indeed, the defendants' evidence indicates that the certification form was not "returned [to the plaintiff] due to incompleteness," and the defendants have not pointed to any denial letters that they sent the plaintiff.  (Doc. Nos. 67 ex. W at 2; 72 ¶ 88.)

On February 18 and 19, 2003, the plaintiff was absent from work because of her migraines.  (Doc. No. 67 ¶ 89.)  On February 19 and March 11, the defendants sent to the plaintiff FMLA certification forms to apply for FMLA leave for the February absence.[3]  (Doc. No. 67 ¶ 90.)  On March 17,

---

[3]The plaintiff denies this averment on the grounds that the record does not prove the plaintiff was sent the forms. She further contends that the defendants "had several FMLA Certifications on file," presumably to indicate that the plaintiff did not need to submit an additional certification form. (Doc. No. 72 ¶ 90.)  However, none of the evidence to which the plaintiff cites supports the contentions and shows that the defendants had approved intermittent leave, but only that the plaintiff had submitted requests for certification. Indeed, Kristina Laurito, the plaintiff's manager as of August 2003, testified at her deposition in response to the plaintiff's counsel's

2003, the defendants denied the plaintiff FMLA leave for the February absence because they had not timely received a certification form, which meant that the absence was chargeable under the RAP.[4]  (Doc. No. 67 ¶ 91.) However, the plaintiff has sworn that she "did not receive any personal certifications that [she] did not submit back to Verizon in the necessary time requirement," which requires the court, for purposes of this motion, to accept that although the defendants prepared the FMLA forms, the plaintiff never received them.  (Doc. Nos. 71, pl's aff. at ¶ 9; 72 ¶ 91.)

On March 17 and 18, 2003, the plaintiff was absent from work because of her migraines.  (Doc. No. 67 ¶ 92.)  On March 20 and 25, 2003, the defendants sent to the plaintiff FMLA certification forms to apply for FMLA leave for the March absence.[5]  (Doc. No. 67 ¶ 93.)  On approximately March 25, 2003, the defendants disciplined the plaintiff for her February and March absences.  In an employee discussion document dated March 25, 2003, the plaintiff's team leader/manager informed the plaintiff that she was being

---

questioning that the plaintiff submitted a letter to the ARC in December 2002 asking whether her FMLA intermittent leave had been pre-approved.  (Doc. Nos. 67 ¶ 29; 71, Laurito dep. at 183:11-185:24.)

[4]Again, the plaintiff denies the defendants' averment on the ground that the plaintiff "was charged for absences that should have been approved for FMLA because Verizon had several FMLA Certifications on file," but the evidence to which she cites does not support the assertion.  (Doc. No. 72 ¶ 91.)

[5] The plaintiff raises the same contentions in respect of the March absence as she raised in respect of the February absence.  (Doc. No. 72 ¶ 93.)  The court has reached the same conclusion.  See supra, at n.4.

placed on step one of the RAP because the defendants did not receive FMLA certification forms. (Doc. No. 67 ¶ 94.) The team leader/manager also informed the plaintiff that if the plaintiff submitted a FMLA leave request, the discipline decision would be reversed. (Doc. No. 67 ¶ 95.) On April 15, the defendants denied the plaintiff FMLA leave for the March absence because they had not timely received a certification form, which meant that the absence was chargeable under the RAP.[6] (Doc. No. 67 ¶ 96 & ex. II.) However, as mentioned above, the plaintiff has sworn that she "did not receive any personal certifications that [she] did not submit back to Verizon in the necessary time requirement," which requires the court , for purposes of this motion, to accept that the plaintiff never received them. (Doc. Nos. 71, pl's aff. at ¶ 9; 72 ¶¶ 91, 96.)

On April 21 and 22, 2003, the plaintiff was absent from work because of her migraines. (Doc. No. 67 ¶ 97.) On May 2, 2003, the plaintiff submitted an FMLA certification form in which Dr. Kovalick certified the plaintiff for intermittent leave for a frequency of three periods per month and a duration of two days per period between April 21, 2003, and April 21, 2004. (Doc. No. 67 ¶¶ 98-99 & ex. KK at 3.) The ARC approved the plaintiff's request,

---

[6]Again, the plaintiff contends that the defendants had FMLA intermittent leave certification forms submitted by the plaintiff, but there is no evidence that any of these had been approved to cover the period of the February or March absences. (Doc. No. 72 ¶ 96.)

covering the April absence and extending for one year.[7]  (Doc. No. 67 ¶ 100.)

From May 30 to June 2, 2003, the plaintiff was absent from work because of her migraines. (Doc. No. 67 ¶ 101.) The defendants sent the plaintiff an FMLA personal certification form, which informed her:

> You have indicated that your current absence relates to a serious health condition for your self, for which you have previously submitted a medical certification, and that this absence falls within the period previously certified by the health care provider, and approved by the Absence Reporting Center. Accordingly, you must complete and return the enclosed [FMLA] Employee Certification Form for Chronic Health Conditions or Scheduled Multiple Treatments . . . .

(Doc. No. 67 ¶ 102 & exs. P at 2 & MM at 2.)  However, as mentioned above, the plaintiff claims she did not receive the form. (Doc. Nos. 71, pl's aff. at ¶ 9; 72 ¶ 102.)  Because the defendants did not receive an FMLA request form, they denied the plaintiff FMLA leave and charged the May-June absence to her under the RAP.  (Doc. No. 67 ¶ 103.)

On June 9 and 10, June 17, and July 7 and 8, 2003, the plaintiff was absent because of her migraines. (Doc. No. 67 ¶¶ 104, 107, 110.) After each absence, the defendants sent the plaintiff an FMLA personal certification

---

[7]The plaintiff contends that she had "FMLA leave approved based on her Certification forms that she filed in September, October and November 2002" until November 2003. As recognized above, there is evidence in the record indicating that the plaintiff submitted leave requests in those three months. The evidence does not, however, show that any of the three requests were approved, in contradiction to the plaintiff's contention. The evidence to which the plaintiff cites, defendant Sparrow's deposition, does not show that the requests were approved, but merely that they were submitted.  (Doc. No. 72 ¶ 100.)

form, which the plaintiff, as discussed above, claims she did not receive. (Doc. Nos. 67 ¶¶ 105, 108, 111; 71, pl's aff. at ¶ 9; 72 ¶¶ 106, 109, 112.) Because the defendants did not receive an FMLA request form, they denied the plaintiff FMLA leave and charged the June absences to her under the RAP.  (Doc. No. 67 ¶¶ 106, 109, 112.)

On July 23, the plaintiff was absent for one-half day of work.  (Doc. No. 67 ¶ 113.)  It is unclear whether the absence stemmed from the plaintiff's migraines or an unrelated cause. (Doc. No. 67 ¶ 114.) The ARC told defendant Sparrow to record the absence as new, instead of as related to a previous condition, but defendant Sparrow at her deposition could not recall why she was told to redesignate the absence.  (Doc. Nos. 71, Sparrow dep. at 77:2-78:7; 72 ¶¶ 36, 39, 114.)  Ms. Laurito testified at her deposition that she believed that the plaintiff had informed the defendants that her July 23, 2003,  absence was unrelated to her migraines, but did not know why the plaintiff's absence records show the absence as "New Absence, Related to Previously Called in Absence." (Doc. Nos. 67 ex. CC; 71, Laurito dep. at 180:4-181:9, 186:11-23; 72 ¶ 114.)  The plaintiff did not request an FMLA certification form or receive a form from the defendants.  Consequently, her July 23, 2003, absence was charged to her under the RAP.  (Doc. Nos. 67 ¶ 115; 71, pl's aff. at ¶ 9; 72 ¶ 115.)

When the plaintiff called in an absence to defendant Sparrow, defendant Sparrow "would always have an attitude" and "be nasty to [her] and . . . make

17

rude comments to [her], like, oh, what is your day off this week?".[8]  (Doc. No. 67 ¶ 140 & ex B, pl's dep. at 170:8-171:13.)  When the plaintiff would respond that she did not know, defendant Sparrow would call her back to say, "just in case you're not planning on coming in, I thought you might like to know your day off is such and such." (Doc. No. 67 ¶ 140 & ex B, pl's dep. at 170:8-171:13.)  The plaintiff's managers also called her to ask if she would return to work the following day. (Doc. No. 67 ¶ 140.) Sometimes they called once daily, but other times they called "so much" and "all day long."  (Doc. No. 67 ¶ 140 & ex B, pl's dep. at 171:14-172:14.)  The plaintiff described the calls as "so out of control." (Doc. No. 67 ex B, pl's dep. at 171:14-172:10.) The plaintiff also testified that "[t]hey [Ms. Laurito and another office manager] come to my home when I call of sick under the guise of bringing me a get well card." (Doc. No. 67 ex B, pl's dep. at 172:19-23.)   The only specific episode, however, the plaintiff could recall was when she was out for gallbladder surgery, a time that is not relevant to this case. The visits were a recent development, within the year or so prior to the plaintiff's deposition in November 2005.  (Doc. No. 67 ex B, pl's dep. at 173:1-23, 174:9-175:6.)  The managers would visit other employees, not just the plaintiff, and would not

_____

[8]The plaintiff denies the defendants' averment, stating, "Plaintiff's entire deposition and affidavit state her allegations in addition to her Complaint which Verizon cites as proving this statement." (Doc. No. 72 ¶ 140.) First, the court notes that the defendants cite not to the plaintiff's complaint, but to her deposition. (Doc. No. 67 ¶ 140.) Second, the court notes that the plaintiff fails to cite to any evidence to support the contention, in violation of paragraph three of Local Rule 56.1.

disturb the plaintiff, such as by knocking on the door or ringing the doorbell. They simply left a card at the door.[9]  (Doc. No. 67 ex B, pl's dep. at 174:1-8.)

Because of the plaintiff's three chargeable absences in May and June and two absences in July, whose FMLA determination was pending, Ms. Laurito discussed the situation with the plaintiff on three occasions in late August.[10]  (Doc. No. 67 ¶ 116.)  In the discussions, Ms. Laurito mentioned that the plaintiff had failed to submit the FMLA certification forms. The plaintiff informed Ms. Laurito that she was not receiving the forms because the ARC had an address on file at which the plaintiff could not receive mail, which Ms. Laurito believed.[11]   (Doc. Nos. 67 ¶ 117; 71, Laurito dep. at 141:16-24, 143:22-144:22; 72 ¶¶ 103, 110, 113, 115, 117.)  The plaintiff told Ms. Laurito that she could not change her address with the ARC because she maintained

---

[9]The plaintiff also stated that "they're constantly telling us that they brag how they have hired private investigators to follow us around when we call off sick."  (Doc. No. 67 ¶ 140 & ex B, pl's dep. at 175:19-177:5.)  However, the plaintiff never identifies who "they" are, and in any event, the testimony is hearsay that the court cannot consider.

[10]The plaintiff denies the defendants' averment in part, but does not cite to any evidence to controvert it.  (Doc. No. 72 ¶ 116.)

[11]Ms. Laurito and defendant Sparrow investigated the plaintiff's claim that she was not receiving mail, including by contacting the ARC and the U.S. Postal Service. (Doc. No. 67 ¶ 118.) The plaintiff contends that the contact with the U.S. Postal Service "is evidence of harassment, since again Sconfienza had not used an excessive number of [FMLA] days." (Doc. No. 72 ¶ 118.) The plaintiff correctly states that the defendants' averments concerning the results of the communications with the ARC and the Postal Service are hearsay and cannot be considered here. (Doc. No. 67 ¶¶ 119, 120.)

19

the address of record because of "tax issues".  (Doc. No. 67 ex. WW at 3.)

Ms. Laurito told the plaintiff that she would have to request the ARC to send the forms to a different address each time she was absent because the ARC's system sent the automatically generated forms to the plaintiff's address of record.[12]  (Doc. No. 67 ¶ 124.)  The plaintiff told Ms. Laurito that "she did not feel that it was her job" to make a separate request after each absence.[13]  (Doc. Nos. 67 ¶ 125; 71, Laurito dep. at 141:16-24, 143:22-144:22.) The plaintiff wanted defendant Sparrow to request, on her behalf, that the ARC send the forms to her non-record address, but Ms. Laurito told the plaintiff that only the plaintiff had the authority to make such a request. (Doc. No. 67 ¶ 125.) The plaintiff told Ms. Laurito that she contacted ARC after each absence to request that forms be sent to her non-record address, but there is no record that the plaintiff in fact contacted the ARC with such a request between May and July, even though the absence administrator informs employees when they call in that if they have not received the FMLA

_____

[12]The plaintiff denies the defendants' averment. (Doc. No. 72 ¶ 124.) However, the evidence to which she cites does not support her contention. (Doc. No. 67 ex. B, pl's dep.)  In addition, the court notes that the plaintiff, not for the first time, cites to the corpus of a deposition transcript without specifying even the page on which her evidence is supposedly found. However, as noted by our and other circuits, "'Judges are not like pigs, hunting for truffles buried in' the record." Doebler Pennsylvania Hybrids, Inc. V. Doebbler, 442 F.3d 812 (3d Cir. 2006). Counsel would be well advised in the future, to properly site to the record, especially in a record this size.

[13]The plaintiff denies the defendants' averment and contends that she contacted the ARC "on many occasions." (Doc. No. 72 ¶ 125.) However, she does not cite to any evidence to support her contention.

forms within five days, they should call the ARC to request them.[14]  (Doc. No. 67 ¶ 121 & ex. WW at 3.)   The plaintiff also told Ms. Laurito that she had requested administrative review of the FMLA denials.[15]  (Doc. No. 67 ¶ 117.) She had faxed a review request to the ARC on July 30, 2003, but there is no indication in the record that the plaintiff sought review prior to July 30, 2003. (Doc. No. 67 ex. WW at 2.)

Prior to the discussions, defendant Sparrow had prepared an employee discussion document dated July 31, 2003, which would have placed the plaintiff on step two of the RAP.[16]  (Doc. No. 67 ¶ 116.) Following the

---

[14]The plaintiff denies the defendants' averment and contends that she contacted the ARC "on several occasions." (Doc. No. 72 ¶ 121.)  However, the evidence to which she cites does not support her contention and shows only that the plaintiff contacted the ARC concerning the FMLA process that concluded in February. (Doc. No. 67 ex. B, pl's dep. at 186:14-188:17.)  In addition, the court notes that the plaintiff again cites to the corpus of a deposition transcript without specifying even the page on which her evidence is supposedly found.

[15]The plaintiff denies the defendants' averment in part, but does not cite to any evidence to controvert it. (Doc. No. 72 ¶ 117.)

[16]On its face, the document appears to have been issued to the plaintiff. It lists a date on which it was provided to the plaintiff and her union and was signed by the union representative and the plaintiff's team leader. (Doc. No. 67 ex. VV.) The defendants aver that the discussion document was prepared, but not issued, and was left for Ms. Laurito to handle.  (Doc. No. 67 ¶ 116.) In her deposition, Ms. Laurito stated that the discussion document was not issued. (Doc. No. 71, Laurito dep. at 141:12-24, 142:23-25.)  Other evidence supports this.  (Doc. No. 67 exs. WW at 4, ZZ at 4, & GGG at 1.)  The plaintiff asserts that she was in fact disciplined.  (Doc. No. 72 ¶¶ 116, 126, 127.)  In support of this claim, she cites to defendant Sparrow's deposition. But defendant Sparrow testified that she had prepared the document and sent it to the plaintiff's supervisor.  She specifically stated that she did not know what happened after she sent the document. (Doc. No. 71, Sparrow dep. at 83:2-

discussions, the discussion document was not issued because Ms. Laurito and the plaintiff's manager "decided to exercise their discretion and not advance Plaintiff beyond Step 1 of the RAP, as a concession to Plaintiff's stated difficulties with receiving forms." (Doc. No. 67 ¶ 126.)  Indeed, the plaintiff was never advanced to step two of the RAP.[17]  (Doc. No. 67 ¶ 127.)

The plaintiff was eventually removed from step one of the RAP.  (Doc. No. 67 ¶ 129.) She was not suspended as a result of her chargeable absences.  (Doc. No. 67 ¶ 131.) However, the plaintiff took excused work days, or "e-time," and vacation days in 2003 to avoid termination for absences that she "did not believe were going to be covered under the FMLA," but cannot specify any dates on which she took vacation days or e-time.[18]  (Doc. Nos. 67 ¶ 134 & ex. B, pl's dep. at 285:14-20; 72 ¶¶ 101, 105, 111, 114, 138.) The e-time may have been unpaid.[19]  (Doc. Nos. 67 ¶ 138; 72 ¶ 138.)  The

_____

84:22.)  Because the plaintiff has not controverted the defendants' averment concerning the preparation and non-issuance of the discussion document and in consideration of the evidence, the court accepts the defendants' averment.

[17]The plaintiff denies the defendants' averment on the same ground discussed supra, at n.15.  (Doc. No. 72 ¶ 127.)

[18]The plaintiff states that, "at trial, the payroll administrator could confirm this allegation with specific dates . . . ." (Doc. No. 72 ¶¶ 135-36.)  However, the plaintiff is obliged to produce such evidence, which would have been easily discoverable, if in fact it exists, prior to the deadline for the submission of dispositive motions.

[19]The plaintiff stated in her *affidavit* that the e-time was unpaid, but, in her *deposition*, she stated that each day of e-time except for one day was paid.  (Doc. Nos. 67 ex. B, pl's dep. at 91:14-92:16, 101:13-102:1; 71, pl's aff. at ¶ 10.)

plaintiff notes that had she been approved for FMLA and not had to take e-time, her leave would have been paid.[20]  (Doc. No. 71, pl's aff. at ¶ 10.)  The plaintiff never sought treatment for any emotional distress because of any problems with the defendants.[21]  (Doc. No. 67 ¶ 143.)

On the plaintiff's year-end evaluation for 2002, the defendants determined that the plaintiff's dependability rating, which accounts for attendance, was "MR," or "meets requirements."  (Doc. No. 67 ex. G at 4.)  On the plaintiff's year-end evaluation for 2003, the defendants determined that the plaintiff's dependability rating was also "MR," in spite of being on step one of the RAP.[22]  (Doc. Nos. 67 ¶ 132 & ex. ZZ at 4; 72 ¶ 132.)  She was rated MR in each month of 2003 except July, when she was rated "DN," or "does not meet position requirements."  (Doc. No. 67 ex. ZZ at 7.)  The plaintiff was given an overall rating of "IN," or "improvement needed to meet position requirements," on the basis of her productivity and quantity requirements.

---

[20]The defendants averred that the plaintiff had been paid for all of her chargeable and nonchargeable absences. However, the plaintiff controverts that in her affidavit. In addition, the evidence to which the defendants cite does not support their averment. (Doc. No. 67 ¶ 130.)

[21]The plaintiff denies the defendants' averment and contends that "Dr. Kovalick's medical records show that Sconfienza discussed the problems she was having at work with Verizon and its FMLA administration." (Doc. No. 72 ¶ 143.) The court notes that the plaintiff again fails to cite to any evidence to support the contention, in violation of paragraph three of Local Rule 56.1.

[22]The plaintiff denies the defendants' averment on the ground that she had been disciplined by being placed on step two of the RAP.  As discussed above, there is no evidence to support this contention.  (Doc. No. 72 ¶ 132.)

(Doc. No. 67 ¶ 133 & ex. ZZ at 7.) In 2004, the plaintiff was also given a dependability rating of MR, including for every month, but an overall rating of DN because of productivity and quantity requirements. (Doc. No. 67 ex. CCC at 4, 7.)

## IV.   Discussion

### A.   The ADA & the PHRA

The ADA provides, in part, that "[n]o covered entity shall discriminate against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment."[23]   42 U.S.C. § 12112(a). Under the disparate-treatment theory, an employer violates the ADA if it is "actually motivated" to discriminate against an employee on the basis of the employee's disability and the disability had a "determinative influence" on the discriminatory action.  Hazen Paper Co., 507 U.S. at 610; see Raytheon, 540 U.S. at 52; Watson v. Southeastern Pennsylvania Transp. Auth., 207 F.3d 207, 214-15 (3d Cir. 2000); see Raytheon Co. v. Hernandez, 540 U.S. 44, 52, 53 (2003) ("'[D]isparate treatment' . . . is the most easily understood type of discrimination.  The employer simply treats some people less favorably than

---

[23]A "covered entity" is "an employer, employment agency, labor organization, or joint labor-management committee."  42 U.S.C. § 12111(2). The parties do not dispute that the defendant is a "covered entity."

24

others because of their race, color, religion, sex, or [other protected characteristic].") (quoting Teamsters v. United States, 431 U.S. 324, 335, n.15 (1977) (omission and final brackets in original)).  In reviewing a motion for summary judgment to determine if there is a genuine issue of material fact concerning whether an employer illegally discriminated against an employee, the court applies the test articulated by the Supreme Court in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973) and refined in Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248 (1981). Raytheon, 540 U.S. at 49 n.3; Shaner v. Synthes, 204 F.3d 494, 500 (3d Cir. 2000) (citing Walton v. Mental Health Ass'n. of Southeastern Pennsylvania, 168 F.3d 661, 667-68 (3d Cir. 1999); Krouse v. American Sterilizer Co., 126 F.3d 494, 500-01 (3d Cir. 1997); Newman v. GHS Osteopathic, Inc., Parkview Hosp. Div., 60 F.3d 153, 156-58 (3d Cir. 1995). The McDonnell Douglas test "establishe[s] an allocation of the burden of production and an order for the presentation of proof in . . . discriminatory-treatment cases."[24]   Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 142 (2000) (quoting St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 506 (1993)) (internal omission in original).

To succeed on an ADA disparate-treatment claim under the McDonnell Douglas test, the plaintiff must establish by a preponderance of the evidence

---

[24]The burden of persuasion always remains upon the plaintiff.  Reeves, 530 U.S. at 143 (citing Burdine, 450 U.S. at 254).

a prima facie case of discrimination.[25] St. Mary's Honor Ctr., 509 U.S. at 506;

Burdine, 450 U.S. at 252-53. A prima facie case requires the plaintiff to prove

three elements. First, the plaintiff must establish that she is disabled within

the meaning of the ADA. Turner, 440 F.3d at 611 (citing Buskirk v. Apollo

Metals, 307 F.3d 160, 166 (3d Cir. 2002)); Gaul v. Lucent Techs., Inc., 134

F.3d 576, 580 (3d Cir. 1998)). Second, the employee must establish that she

is a qualified individual within the meaning of the ADA. Turner, 440 F.3d at

611 (citing Buskirk, 307 F.3d at 166; Gaul, 134 F.3d at 580). A qualified

individual is "an individual with a disability who, with or without reasonable

accommodation, can perform the essential functions of the employment

position that such individual holds or desires." 42 U.S.C. § 12111(8).

Finally, the plaintiff must establish that she has suffered an "adverse

employment decision as a result of discrimination." Turner, 440 F.3d at 611

(citing Buskirk, 307 F.3d at 166; Gaul, 134 F.3d at 580). An adverse

---

[25]If the plaintiff succeeds in establishing a prima facie case, there is a presumption of discrimination. St. Mary's Honor Ctr., 509 U.S. at 506 (citing Burdine, 450 U.S. at 254). The burden then shifts to the defendant to rebut the presumption by "produc[ing] evidence that the plaintiff was rejected, or someone else was preferred, for a legitimate, nondiscriminatory reason." Reeves, 530 U.S. at 142 (citing Burdine, 450 U.S. at 254). If the defendant produces evidence of a nondiscriminatory reason for the challenged conduct, the presumption "drops from the case." St. Mary's Honor Ctr., 509 U.S. at 507 (quoting Burdine, 450 U.S. at 255). The burden of production then returns to the plaintiff to demonstrate by a preponderance of the evidence that the defendant's proffered reason is pretextual and "unworthy of credence." Reeves, 530 U.S. at 143 (quoting Burdine, 450 U.S. at 256). In this case, the defendants have not advanced arguments beyond the prima facie case, and the court need not, and therefore will not analyze the issues under the burden-shifting steps.

employment decision means "an action by an employer that is 'serious and tangible enough to alter an employee's compensation, terms, conditions, or privileges of employment.'" Storey v. Burns Int'l Sec. Servs., 390 F.3d 760, 764 (3d Cir. 2004) (quoting Cardenas v. Massey, 269 F.3d 251, 263 (3d Cir. 2001) (internal quotation omitted)).  An "adverse employment decision" also includes an employer's failure to accommodate, reasonably, the employee's disability. Williams, 380 F.3d at 761 (citing Taylor, 184 F.3d at 306). A plaintiff establishes that an employer has failed to reasonably accommodate her if she shows: the employer knew of her disability; she sought accommodation; the employer did not in good faith seek to accommodate her; and, but for the employer's lack of good faith, she could have been accommodated. Id. at 772 (quoting Taylor, 184 F.3d at 319-20)).

Under the harassment theory, an employer violates the ADA if a disabled employee is subjected to a hostile or abusive work environment. Walton, 168 F.3d at 666-667.  To succeed on an ADA harassment claim, a plaintiff must establish five elements. Id. at 667. First, the plaintiff must establish that she is qualified under the ADA. Id.  Second, the plaintiff must establish that she was subjected to harassment. Id.  Third, the plaintiff must establish that the harassment stemmed from her disability or request for accommodation. Id. Fourth, the plaintiff must establish that the harassment was "sufficiently severe or pervasive to alter the conditions of her employment and to create an abusive working environment." Id.  The harassment must be

27

"objectively hostile or abusive." Id.  In determining the objective hostility of alleged harassment, a court must consider the totality of the circumstances. Id.; see Harris v. Forklift Sys., Inc., 510 U.S. 17, 22-23 (1993) ("These [circumstances] may include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.") Also, the plaintiff must "have perceived it as a hostile or abusive environment." Id. Finally, the plaintiff must establish that the defendant "knew or should have known of the harassment and failed to take prompt effective remedial action."  Id.

Here, the court finds that the plaintiff cannot establish a prima facie case of discrimination in violation of the ADA. The defendants advance arguments on the disability and adverse employment decision elements.  The court will discuss only whether there was an adverse employment decision.[26] The plaintiff has not identified any action or a concert of actions that a reasonable factfinder could consider as seriously and tangibly altering the conditions of her employment.  The only substantiated discipline to which the plaintiff was subjected was advancement to step one of the RAP.  However, that resulted in no actual penalty and was essentially a warning that future absences could result in punishment. It neither was serious nor had any

_____

[26]The record is unclear as to whether the plaintiff was disabled, and the court will dispense with the analysis as unnecessary.

impact on the terms of the plaintiff's employment.

The so-called harassment to which defendant Sparrow and various managers and Dr. Miller subjected the plaintiff and Dr. Kovalick also were not serious and did not affect the plaintiff's conditions of employment. The substantiated episodes consist of defendant Sparrow's attitude, question, and return calls when the plaintiff called in her absences, the managers' calls asking when the plaintiff would return to work, the managers' delivery of the get well card, and Dr. Miller's calls to Dr. Kovalick. They simply fail to rise to the threshold of an adverse action.

The paperwork requirements for FMLA leave likewise did not affect the plaintiff's terms of employment. Nor did the plaintiff's use of vacation days and e-time instead of FMLA leave. Although the plaintiff has failed to identify any specific days on which she allegedly used vacation days or e-time instead of FMLA leave, even accepting that such days exist, there is no connection between doing so and any serious affect on her employment decision. All but one of the days were paid. The plaintiff has not alleged that she had to forego any future vacation or e-time because she used it instead of FMLA leave. Moreover, the evidence shows that the plaintiff did not have to use these days, that it was not the result of any action by the defendants, but was instead her choice to avoid the hassle of applying for FMLA.

In all these instances, the defendants' actions had no bearing on the plaintiff's "compensation, terms, conditions, or privileges of employment." The

29

plaintiff was not fired, demoted, or otherwise punished because she sought FMLA leave. In fact, she received satisfactory performance reviews with respect to her absences.  She was also approved for FMLA leave when she satisfied the defendants' reasonable paperwork requirements.

The plaintiff has also failed to produce evidence that the defendants failed to reasonably accommodate her. It is clear that the defendants knew of the plaintiff's disability, which the court will accept here as qualified, and the plaintiff sought accommodation by applying for FMLA leave.  However, there is no evidence that the defendants, in bad faith, denied the requested FMLA leave.  There are three factual bases for the plaintiff's failure-to-accommodate claim: the denial of the November 20, 2002, intermittent leave request; the February and March 2003 absences for which FMLA was denied; and, the absences for which FMLA leave was denied while the plaintiff was approved for intermittent leave.  At all times, the plaintiff was subject to the certification requirements that applied to all the defendants' employees, and there is no evidence that the plaintiff was unaware of the requirements, which she had hitherto complied.  She was required to show the defendants that her desired leave was validly requested and related to her medical condition.[27]  To do this, they required her to submit a medical certification form for her intermittent leave and an employee form for the individual absences constituting the

_____

[27]The validity of the defendants' certification procedures is discussed below in the context of the FMLA.

intermittent leave. When the plaintiff properly submitted the forms, the defendants approved her leave.  When the plaintiff improperly submitted or failed to submit the forms, the defendants denied her leave.

The plaintiff's November 20, 2002, intermittent leave request was properly denied after the plaintiff, through her physician, failed to clarify and authenticate the request.[28]  The February and March 2003 absences were denied because the plaintiff failed to properly submit the certification forms. The May 19, 2003, intermittent leave request was approved, but the defendants still properly and reasonable required the plaintiff to certify the individual absences within that leave period.  The plaintiff failed to certify the individual absences. In the two latter instances, the plaintiff never received the necessary certification forms.  But that was not the result of any bad faith activities on the part of the defendants. Rather, it was the unfortunate consequence of the plaintiff's use of a primary residence as her address of record at which she, allegedly, could not receive mail.  She had the option of obtaining the forms through other means, but did not want to go through the hassle of doing so on each occasion even though no one else could obtain the forms for her. There is, thus, no evidence upon which a reasonable factfinder could find that the defendants acted in bad faith in denying the plaintiff's FMLA leave requests.  Consequently, the "but-for" element also

_____

[28]This, and the other examples discussed in this section, are discussed in greater detail in the FMLA section below.

fails.

The court further finds that the plaintiff has not established a prima facie case of a hostile work environment because she cannot establish that she suffered from harassment serious enough to constitute a violation of the ADA. There are only four substantiated incidents of harassment: defendant Sparrow's attitude when the plaintiff called in her absences, questioning about whether the plaintiff knew her day off that week, and subsequent call back; the unnamed managers' calls asking when the plaintiff would return to work; and, the managers' delivery of the get well card. No reasonable factfinder could find that the concert of these actions constitutes severe or pervasive harassment so as to alter the conditions of the plaintiff's employment and to create a hostile workplace because the incidents were not objectively hostile or abusive. The circumstances are limited to three events, which is too infrequent to be severe or pervasive. The incidents were not in any manner severe, threatening, or humiliating. Other than defendant Sparrow, the managers, and the plaintiff, no one would know of the incidents without being told because they all occurred privately, on the phone or at the plaintiff's home.  There was no threat in the actions.  Rather, the actions at most were offensive only to the plaintiff because she did not wish to be disturbed. A reasonable employee could, in fact, find that defendant Sparrow's and the managers' behavior was undertaken to nicely or properly keep an absent employee informed about her schedule, to be aware of their office's

32

attendance, or to show that they cared. Even if these were unwarranted findings, it would be impossible to find that the incidents rise to the level of a hostile workplace. The actions did not interfere with the plaintiff's work performance. Merely because the plaintiff perceived the actions as hostile is insufficient to sustain her claim here.

Accordingly, the court finds no genuine issue of material fact and recommends that the defendants' motion for summary judgment be granted with respect to the plaintiff's disparate-treatment and harassment claims under the ADA and the PHRA as against defendant Verizon and the plaintiff's complaint be dismissed with respect to these claims. In addition, on the basis of the court's findings that no discrimination occurred, the court, without further analysis, finds that the PHRA claim against defendant Sparrow is meritless and recommends that the defendants' motion for summary judgment be granted with respect to the plaintiff's claim under the PHRA as against defendant Sparrow and the plaintiff's complaint be dismissed with respect to this claim.

## B.    The FMLA

The FMLA purports to balance an employer's legitimate interests with an employee's ability to take reasonable medical leave. 29 U.S.C. § 2601(b); see Callison v. City of Philadelphia, 430 F.3d 117, 119 (3d Cir. 2005).  To accomplish its goal, the FMLA provides that an eligible employee "shall be

entitled to a total of 12 workweeks of leave during any 12-month period . . . because of a serious health condition that makes the employee unable to perform the functions of [her] position."[29]   29 U.S.C. § 2612(a)(1)(D); see Callison, 430 F.3d at 119.  An employee is entitled to no more than twelve weeks of FMLA leave.  Ragsdale v. Wolverine World Wide, Inc., 535 U.S. 81, 93-94 (2002); 29 C.F.R. § 825.200(a).  If medically necessary, an employee may take FMLA leave intermittently.  29 U.S.C. § 2612(b)(1).

An employer may require an employee seeking FMLA leave to timely submit a form signed by the employee's health care provider certifying the necessity of FMLA leave for the employee. Id. at 2613(a). If an employee submits a complete certification, the employer may not request more information than is required by law. id. at § 825.307(a). However, the employer may seek clarification or authentication from the employee's health care provider, but only with the employee's permission. Id. In addition, an employer may institute policies to prevent abuse of FMLA leave so long as they do not conflict with or diminish the rights provided by the FMLA. Callison, 430 F.3d at 120-121. For example, the Court of Appeals for the Third Circuit upheld an employer's policies requiring that an employee absent on sick leave stay at home during working hours unless her leaving home is

---

[29]The parties do not dispute that the plaintiff is an eligible employee as defined by 29 U.S.C. § 2611(2) or that defendants Verizon are employers covered by the FMLA as defined by 29 U.S.C. § 2611(4)(A). Defendants Verizon calculate FMLA leave on a calendar-year basis.  (Doc. Nos. 69 ¶ 7 & 96 ¶ 7.)

related to the cause of her absence, call the employer upon leaving and returning home, and be subject to calls or visits by the employer. Id. at 118, 120-121; see id. at 121 ("[T]here is no right in the FMLA to be 'left alone.' Nothing in the FMLA prevents employers from ensuring that employees who are on leave from work do not abuse their leave . . . .") (internal citation omitted).

The FMLA provides various protections for employees who are eligible for or have taken FMLA leave. See 29 U.S.C. § 2615; 29; Callison, 430 F.3d at 120 ("The FMLA is meant to prohibit employers from retaliating against employees who exercise their rights, refusing to authorize leave, manipulating positions to avoid application of the Act, or discriminatorily applying policies to discourage employees from taking leave.") (citing 29 C.F.R. § 825.220). Under the "entitlement" or "interference" provision, it is illegal for an employer to "interfere with, restrain, or deny the exercise of, or the attempt to exercise, any right" under the FMLA. 29 U.S.C. § 2615(a)(1); see Callison, 430 F.3d at 119; Conoshenti, 364 F.3d at 141-42; Bearley, 322 F.Supp.2d at 570-71. "Any violations of the Act or of these regulations constitute interfering with, restraining, or denying the exercise of rights provided by the" FMLA. 29 C.F.R. § 825.220(b). Interfering with an employee's rights under the FMLA includes "refusing to authorize FMLA leave" and "discouraging an employee from using such leave." Id. To establish a violation of the entitlement provision, an employee need only show that she was entitled to FMLA

35

benefits, 29 U.S.C. § 2612(1), and the employer interfered with them, 29 U.S.C. § 2614(a)(1). Callison, 430 F.3d at 119. "An interference action is not about discrimination, it is only about whether the employer provided the employee with the entitlements guaranteed by the FMLA." Id. at 120. Consequently, it is irrelevant whether the employer had a legitimate reason to deny the benefits or treated disparately or similarly other employees.[30] Id. at 119-20.

Under the interference provision, an employee may recover for any prejudice suffered by the interference. 29 U.S.C. § 2617; Nevada Dep't of Human Res. v. Hibbs, 538 U.S. 721, 739-40 (2003); Ragsdale, 535 U.S. at 89; Conoshenti, 364 F.3d at 143. "The remedy is tailored to the harm suffered." Ragsdale, 535 U.S. at 89. An employer who violates § 2615 is liable to an employee "for damages equal to" either lost wages, benefits, and other compensation, or, where no wages, benefits, or other compensation was lost, "actual monetary losses sustained by the employee as a direct result of the violation," plus interest on the damages. 29 U.S.C. § 2617(A)(I), (ii). If the employer's violation was not in good faith and unreasonable, it is also liable for liquidated damages equal to the amount of damages plus interest. Id. § 2617(A)(iii). An employee may also seek equitable relief, including "employment, reinstatement, and promotion." Id. § 2617(B).

---

[30]This means the McDonnell Douglas burden-shifting test does not apply.

Here, the court finds that the defendants did not interfere with the plaintiff's rights under the FMLA. There are three factual bases for the plaintiff's interference claim: the denial of the November 20, 2002, intermittent leave request and subsequent communication between Dr. Miller and Dr. Kovalick; the chargeable absences taken in February and March 2003; and, the absences for which FMLA leave was denied while the plaintiff was approved for intermittent leave. With respect to the first basis, it likely that the defendants violated the plaintiff's rights under the FMLA. There is no indication that Dr. Miller had the plaintiff's permission to contact Dr. Kovalick, which violates the regulations implementing the FMLA. However, there is no cognizable interference claim because plaintiff cannot establish that she suffered any prejudice because of the violation. She has not identified any wages or benefits lost as a result of Dr. Miller's actions and the denial of her intermittent leave request. Although the plaintiff contends that she used vacation days and e-time instead of seeking FMLA leave, she has not produced any evidence that she used those benefits as a result of Dr. Miller's actions or at all subsequent to, and as a result of, the pendency of the November FMLA request. Indeed, the plaintiff has not identified a specific date between 2003 and 2005 in which she used her benefits. As mentioned above, the plaintiff's statement that she would call at trial a payroll administrator to testify to those dates is unavailing. The plaintiff had an obligation to provide evidence of the specific loss of her wages or benefits

during discovery, before the time for dispositive motions had expired.

In addition, there is no prejudice because the defendants approved, as FMLA leave, the individual November and December absences prior to the November request's denial and were within their rights to deny FMLA leave after being unable to clarify or authenticate the request with Dr. Kovalick.  The plaintiff, who was aware at least from her physician of the defendants' interest in speaking to Dr. Kovalick, was obliged to assist the defendants herself or through her physician in clarifying the FMLA request.  Instead, she concurred in Dr. Kovalick's decision not to take Dr. Miller's calls, did not ask Dr. Kovalick to call anyone else at Verizon, and did not herself call Verizon to rectify the situation. It may well be that Dr. Miller was rude, even harassing, however, that does not obviate the plaintiff's obligation to communicate with her employer the basis of her FMLA entitlement, through some other means if she did not wish to deal with Dr. Miller.

With respect to the second period, the uncontroverted evidence indicates that the plaintiff did not timely, or for that matter at all, submit certification forms for the February and March absences.  Contrary to her contention, there is no evidence that an intermittent leave request had previously been approved that would cover those absences. The plaintiff was required to submit certification to the defendant to be approved for FMLA leave, and she failed to do so. The plaintiff never received the request forms; however, that is not because of any fault of the defendants. Rather, it is

because the plaintiff insisted on maintaining as a primary residence an address at which she could not receive mail. The plaintiff was aware that she could have the forms sent to another address by contacting the ARC after each absence, but she balked at the idea.  She also knew that she was supposed to contact the defendants if she did not receive the forms within five days. There is no evidence that the plaintiff timely, or at all, requested FMLA forms after failing to receive them.  In addition, the court notes that the plaintiff had previously taken FMLA leave and was aware that she had to submit certification forms.  Furthermore, the plaintiff has not shown any prejudice as a result of the denied FMLA leave during the second period.  As discussed above, there is no evidence that the plaintiff lost any benefits or wages as a result of the denials.  She was placed on step one of the RAP, but that was in essence a warning and led to no actual damages.

With respect to the third period, the defendants' policy requiring the plaintiff to certify that a particular absence was related to her approved FMLA intermittent leave does not conflict with or diminish her rights under the FMLA. An employer is permitted under certain circumstances to ensure that its employees do not abuse FMLA leave.  The defendants' policy is a reasonable means of ensuring that the plaintiff did not abuse her FMLA leave without infringing on her statutory entitlements. There is no provision of the FMLA that prohibits an employer from using an employee certification form under the circumstances here.  In addition, the defendants' properly denied the plaintiff

FMLA leave when she failed to return her employee certifications. As discussed above, the fact that the plaintiff did not receive the forms is not the defendants' fault and did not obviate her obligation to obtain the forms through other means and timely submit them.  Furthermore, as discussed above, the plaintiff suffered no prejudice from the defendants' denials of her FMLA requests.

Generally, with respect to plaintiff's claims of harassment during all three periods, the plaintiff has not identified any right that was violated.  There is no evidence that the plaintiff's rights under the FMLA were interfered with by defendant Sparrow's attitude, the managers' calls asking when the plaintiff would return, or the "get-well drive bys."  The actions did not serve to deny the plaintiff an entitlement or otherwise discourage her from applying for FMLA leave.  The record indicates that the plaintiff did apply for FMLA leave, which the defendants' denied only when her certification was incomplete. In addition, as the Third Circuit recognized in Callison, there is no right to be left alone. The defendants were within their rights, at least under the FMLA, to communicate with the plaintiff to ensure she was absent on FMLA-related reasons or for other purposes.  The plaintiff's evidence also does not indicate harassing action.  The only specific evidence shows that defendant Sparrow had an attitude and called the plaintiff to let her know when the plaintiff's day off was, managers called to ask when the plaintiff would return to work, and managers dropped off a get well card without, in any way, disturbing the

40

plaintiff. Those are not actions upon which an interference action can be based. Furthermore, as discussed above, the plaintiff has alleged no actual damages as a result of these actions.

Accordingly, the court finds that the plaintiff has failed to show a genuine issue of material fact and recommends that the defendants' motion for summary judgment be granted with respect to the plaintiff's claim of unlawful interference with her rights under the FMLA and the plaintiff's complaint be dismissed with respect to this claim.

### C.     Retaliation in Violation of the ADA and the FMLA

The ADA and the FMLA prohibit an employer from retaliating against an employee because the employee exercised her rights under the statutes or "oppos[ed] any practice made unlawful by" them. 29 U.S.C. § 2615(a)(2), (b) (FMLA); 42 U.S.C. § 12203(a) (ADA); 29 C.F.R. § 825.220(c), (e) (FMLA); see Williams, 380 F.3d at 758-59 (ADA); Conoshenti, 364 F.3d at 146 (FMLA).  A retaliation claim is analyzed under the McDonnell Douglas test, which is the same as described above except in the elements of a prima facie case.  To establish a prima facie case of retaliation in violation of the ADA or the FMLA, the plaintiff must prove three elements by a preponderance of the evidence. First, the plaintiff must show that she engaged in an activity protected under either statute.  Williams, 380 F.3d at 759 (citing Fogleman v. Mercy Hosp., 283 F.3d 561, 567-68 (3d Cir. 2002)); Conoshenti, 364 F.3d at

41

146 (citing 29 C.F.R. § 825.220(c)).

Second, the plaintiff must show that she suffered a materially adverse action.[31] White, 126 S.Ct. at 2414-15. Material adversity means that the action "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." Id. (quoting Rochon v. Gonzales, 438 F.3d 1211, 1219 (D.C. Cir. 2006) (internal quotation omitted). An action is material if it is significant, not trivial. Id. at 2415. An action is significant if it interferes with an employee's "unfettered access" to her FMLA and ADA rights by being "likely 'to deter victims of discrimination from complaining to the EEOC,' the courts, and their employers." Id. (quoting Robinson v. Shell Oil, 519 U.S. 337, 346 (1997)). An action is trivial, i.e., it will not deter an

---

[31]The Third Circuit, with other circuits, had required a showing of an adverse employment decision as the second element of a retaliation case. Robinson v. Pittsburgh, 120 F.3d 1286 (3d Cir. 1997) see White, 126 S.Ct. at 2410-11. But the Supreme Court expressly rejected such a standard in White. 126 S.Ct. at 1214-15. The Third Circuit has not yet addressed the application of White, which deals solely with Title VII cases, to non-Title VII cases. However, the Title VII retaliation framework has generally been applied to non-Title VII cases, and every Court of Appeals that has considered a non-Title VII retaliation case subsequent to White has applied it. See, e.g., Carmona-Rivera v. Puerto Rico, 464 F.3d 14, 19-20 (1st Cir. 2006) (applying White to ADA); Kessler v. Westchester County Dep't of Soc. Servs., 461 F.3d 199, 207-209 (2d Cir. 2006) (applying White to Age Discrimination in Employment Act); Csicsmann v. Sallada, 2006 WL 3611729, at *4-*5 (4th Cir. 2006) (unpublished) (applying White to FMLA and Employee Retirement Income Security Act); Peace v. Harvey, 2006 WL 3068677, at *1 (5th Cir. 2006) (unpublished) (applying White to Equal Employment Opportunity Commission complaint); Haynes v. Level 3 Communications, LLC, 456 F.3d 1215, 1228-29 (10th Cir. 2006) (applying White to ADA and ADEA). This court expects that the Third Circuit would do likewise. In addition, the parties both accept that White would apply here. Therefore, the court applies the White standard.

employee from pursuing her rights, if it is related to "those petty slights or minor annoyances that often take place at work and that all employees experience." Id.; see id. ("Title VII, we have said, does not set forth 'a general civility code for the American workplace.'") (quoting Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 80 (1998)).  This includes a "simple lack of good manners."  Id.

The reasonableness of the material adversity standard means that the standard is objective. Id. It entails an investigation by the court into the "particular circumstances" of the claim.  Id.; see id. ("Context matters.").  But "this standard does not require a reviewing court or jury to consider 'the nature of the discrimination that led to the filing of the charge.'"  Id. (quoting id. at 2420 (Alito, J., dissenting)).  Instead, the court must focus solely on the alleged retaliatory action.  Id.  Finally, the plaintiff must show that the adverse decision was causally related to the exercise of her ADA or FMLA rights. Williams, 380 F.3d at 759 (citing Fogleman v. Mercy Hosp., 283 F.3d 561, 567-68 (3d Cir. 2002)); Conoshenti, 364 F.3d at 146 (citing 29 C.F.R. § 825.220(c)).

Here, the court finds that the defendants did not retaliate against the plaintiff because they did not take any materially adverse actions against her. The defendants concede the first element and do not argue the second element, and the court will therefore focus on the second element. The plaintiff has identified as the basis of her retaliation claim that she "was

43

retaliated against for taking FMLA leave and requesting a reasonable accommodation in the nature of being allowed time off," including by her being disciplined, which forced her to use vacation days and e-time and thereby lose money, her doctor being harassed, and her being placed on the "RAP system which will lead to termination." (Doc. Nos. 71 at 25; 78 at 2.) She also has identified the defendants' characterizing absences as new instead of as related to her approved intermittent leave, requiring her to "fill out numerous FMLA leave papers when her condition has remained the same," and the managers' harassment as retaliatory. (Doc. Nos. 1 ¶ 17; 71 at 25.)

But none of the actions shown by the evidence support her claim. Indeed, many of the plaintiff's retaliation claims are based on the very actions that underlie her FMLA interference and ADA discrimination claims and are not retaliatory in nature. The only disciplinary action supported by the record is the plaintiff's advancement to step one of the RAP. Punishment for exercising her rights would constitute retaliation. But no reasonable factfinder could find that the lowest level of discipline, which effectively constituted a warning that future chargeable absences could lead to the employee's being advanced to step two and lacked any actual penalty, would objectively deter a reasonable employee from pursuing her FMLA and ADA rights. The plaintiff would only, possibly, face termination under the RAP at step five. Furthermore, there is no evidence that the step-one advancement was at all related to the plaintiff's attempt to exercise her FMLA or ADA rights. Instead,

it stemmed from her failure to properly submit required and lawful certification forms, which is the substance of her underlying claims.

The plaintiff links her alleged use of vacation days and e-time to her disciplining. As discussed above, the plaintiff has failed to identify any specific days on which she used vacation days or e-time in lieu of seeking FMLA leave.  But even if the plaintiff had produced evidence showing that she took such time off after any of her FMLA requests were denied, to avoid her perceived hassle of applying for FMLA leave, it would be insufficient to show a materially adverse action. Her use of vacation days and e-time is not a retaliatory action, but is related to the underlying alleged discrimination. Moreover, it was not an action taken by the defendants or an action that any evidence shows the defendants could have expected or wanted the plaintiff to take as a consequence of their denying her FMLA leave requests. Likewise, the defendants' alleged harassment of Dr. Kovalick, as discussed above, was related to the underlying discrimination and does not constitute a retaliatory action.  Even if it did, it would not objectively be materially adverse.  Dr. Kovalick spoke with Dr. Miller once and thereafter refused, with the plaintiff's consent, to speak with him again.  That is an objectively nonadverse action. A reasonable employee would not be deterred by those circumstances because they are the trivial bureaucratic annoyances that employees regularly face.

The paperwork of which the plaintiff complains and defendant Sparrow's

45

coding of absences as new, instead of as related to a prior condition, also are related to the plaintiff's underlying FMLA and ADA claims and are not retaliatory.  Even if they were, they could not be found materially adverse.  As with the clarification calls to Dr. Kovalick, they are trivial bureaucratic annoyances common to employees everywhere.  No objective factfinder could find that a reasonable employee would be deterred by such verification requirements, which, tedious as they might be, are lawful means of preventing abuse. The paperwork requirements were part of a generally applicable policy and not something inflicted solely on the plaintiff. Whether the defendants were right or wrong in coding absences as new instead of as being under her approved intermittent leave is additionally irrelevant because there is no evidence that the plaintiff submitted or requested any FMLA forms, which she would need to do for a new or pre-approved absence.  Thus, there is no link between defendant Sparrow's action and alleged retaliation.

The other acts of harassment–defendant Sparrow's follow-up calls, the managers' calls, and the managers' delivery of the get well card–to constitute retaliation, the court cannot find that any objective factfinder could reasonably determine were materially adverse. These actions were merely trivial, not significant, actions. Some employees might be annoyed by them, but they would still be no more than the typical incidents of employment. Other employees might in fact be reassured by such gestures by an employer.  No reasonable employee could perceive them as a deterrent to the exercise of

her employment rights.

Finally, the court notes that in <u>White</u>, the court considered a case in which the plaintiff had been reassigned to other duties and had been suspended without pay for thirty-seven days. The Court found that both actions could potentially be retaliatory because the reassignment could entail more arduous duties and, even though the employer eventually withdrew the suspension and paid the employee for those days, the plaintiff still had to endure the suspension. <u>Id.</u> at 2416-18. Here, there are no comparable facts. The plaintiff was never reassigned or suspended. Indeed, the plaintiff received good annual reviews as to her attendance. Simply, on the record before it, the court can find no action that is objectively material and adverse. Furthermore, the concert of events do not change the court's analysis. The totality of the circumstances no more indicates a plan or practice of the defendants to retaliate against the plaintiff than the actions considered individually. There is no objective, reasonable basis under which the defendants' action with respect to the plaintiff can be found retaliatory. Accordingly, the court finds there is no genuine issue of material fact and recommends that the defendants' motion for summary judgment be granted with respect to the plaintiff's claim of retaliation in violation of the FMLA and the ADA and the plaintiff's complaint be dismissed with respect to this claim.

47

**V.    Conclusion**

On the basis of the foregoing, **IT IS RECOMMENDED THAT**:

(1).    the defendants' motion for summary judgment be **GRANTED** with respect to the plaintiff's disparate-treatment and harassment claims under the ADA and the PHRA against defendant Verizon and the plaintiff's complaint be **DISMISSED** with respect to these claims;

(2).    the defendants' motion for summary judgment be **GRANTED** with respect to the plaintiff's claim under the PHRA against defendant Sparrow and the plaintiff's complaint be **DISMISSED** with respect to this claim;

(3).    the defendants' motion for summary judgment be **GRANTED** with respect to the plaintiff's claim of unlawful interference with her rights under the FMLA against defendant Verizon and the plaintiff's complaint be **DISMISSED** with respect to this claim; and,

(4).    the defendants' motion for summary judgment be **GRANTED** with respect to the plaintiff's claims of retaliation in violation of the FMLA and the ADA against defendant Verizon and the plaintiff's complaint be **DISMISSED** with respect to these claims.

S/ Malachy E. Mannion
**MALACHY E. MANNION**
United States Magistrate Judge

Date: January 22, 2007
O:\shared\REPORTS\2005 Reports\05-0272.01.wpd