## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| TERRI SCONFIENZA, | : | No. 3:05cv272 |
| **Plaintiff,** | : | |
| | : | (Judge Munley) |
| | : | |
| v. | : | |
| | : | |
| VERIZON PENNSYLVANIA, Inc., | : | |
| d/b/a VERIZON, and | : | |
| LESLEE SPARROW, | : | |
| **Defendants** | : | |

### MEMORANDUM

Before the court are plaintiff's objections (Doc. 84) to the report and recommendation (Doc. 81) of Magistrate Judge Malachy E. Mannion in the instant employment discrimination case. Having been fully briefed, the matter is ripe for disposition.

**Background**

Plaintiff began working for Verizon in October 1990. (Defendants' Statement of Material Facts Pursuant to L.R. 56.1 (Doc. 67-3) (hereinafter "Defendant's Statement") at ¶ 1)[1]. Her employment continued as of April 2006, when the defendants filed the instant summary judgment motion. (Id.). Beginning in 2000, plaintiff worked as a Maintenance Administrator at the Verizon Repair Resolution

---

[1]We will cite to the Defendants' Statement of Material Facts when the facts are not in dispute. When those facts are in dispute we will note both sides' positions. The defendants' statement of material facts is attached to their motion for summary judgment.

Center in Wilkes-Barre, Pennsylvania.  (Id. at ¶ 2).  As a Maintenance Administrator, among plaintiff's job duties were answering incoming calls from customers who had problems with their Verizon service and taking orders from those seeking new service.  (Id. at ¶ 4).[2]

For approximately ten years, plaintiff suffered from migraine headaches.  (Id. at ¶ 5).  Dr. Kimberly Kovalick began treating plaintiff for this condition on May 22, 2001.  (Id. at ¶ 6).  On that day, Dr. Kovalick diagnosed plaintiff with "common migraine, without mention of intractable migraine."  (Id. at ¶ 7).  Defendants contend that by this diagnosis Dr. Kovalick meant that plaintiff "'has a history of migraines, but they're not something that she has on a daily basis.'"  (Id. at ¶ 8).  The treatment currently used by Dr. Kovalick had helped the plaintiff.  (Id.).  Plaintiff argues that by "intractable" the doctor meant "'that there's nothing I'm doing that's giving this patient relief,'" and that this diagnosis was not grounds to find that a patient was not disabled by the condition.[3]  (Plaintiff's Statement at ¶ 8).  Dr. Kovalick's diagnosis did

---

[2]Plaintiff objects to this statement, claiming that the evidence to which defendant cites "speak[s] for [itself]."  (Statement of Facts in Dispute (Doc. 72) (hereinafter "Plaintiff's Statement") at ¶ 4).  The evidence to which plaintiff points, Attachment M of defendants' motion for summary judgment, describes the duties of a Maintenance Administrator for Verizon.  The defendants summarize the duties of this position, which appears to be that of a general customer service operator.  Besides "taking calls" as described by the defendants, this position also involves operating a computer, scheduling service appointments, maintaining and updating customer records, dispatching technicians, and other duties associated with such service work.  (See Defendants' Statement, Attachment M).

[3]We fail to see how plaintiff has stated grounds to deny this statement.  Both parties appear to agree on the definition of "intractable" and Dr. Kovalick's testimony that plaintiff's migraines were not intractable is consistent.  In any case, the parties have not argued

not change. (Defendants' Statement at ¶ 9). Plaintiff's migraines typically coincide

with the beginning of her menstrual period, though she also claims that stress can

provoke the headaches. (Defendants' Statement at ¶ 10).

Dr. Kovalick testified that plaintiff reported she usually suffered from migraines

once a month, at the time of her period. (Kovalick Dep. At 63). The parties disagree

about how long plaintiff's migraines typically last; defendants contend "they last, at

most, a day or two" while plaintiff insists that plaintiff "stated that when she gets a

migraine it can last for four days." (Defendants' Statement at ¶ 12, Plaintiff's

Statement at ¶ 12).[4] Plaintiff sometimes vomited when she had a migraine, and

during a severe episode had trouble concentrating, thinking, caring for herself,

_____

whether plaintiff qualified as a person with a disability under the Americans with Disabilities Act (ADA), 42 U.S.C. §§ 12101, *et seq.*

[4]In her deposition, plaintiff testified in the following manner:
Q. . . . how long [do] these migraines last when you get them?
A. Overall, it could be a day or two, it could come and go.
Q. So if I understand you correctly, sometimes they can last a day or two?
A. I can have one today, and it could seem like it's going away, but just hanging there, but not as bad; and then the next day I could have one again. So to me that really didn't go away. . . .
Q. . . . . if I understood your testimony correctly sometimes the symptoms can appear to get better, but then the next day or later the same day they come back again.
A. Exactly.
Q. And sometimes it could last and ebb and flow, so to speak, over the course of a day or two?
A. Yes.
Q. And sometimes it doesn't last a day or two?
A. Yes. (Plaintiff's Dep. at 73-74).
We note that nowhere does plaintiff claim that her migraines last four days, though plaintiff cites to this passage from the deposition as evidence that they do. The testimony, however, is not entirely clear. Since the number of days that plaintiff suffers from migraines when she gets them is not material to our conclusion here, we will not resolve this question.

3

working and driving.  (Defendants' Statement at ¶¶ 14-15).  Plaintiff took Motrin in an attempt to relieve her headaches and, "sometimes," if she "c[ould] take the Motrin early enough when [she] [felt] it coming on," she was able to reduce her usual discomfort and she could "nip it in the bud before it becomes full blown."  (Plaintiff's Deposition (hereinafter "Plaintiff's Dep."), included as Attachment B to Defendants' Statement, at 75)[5].  Plaintiff occasionally suffered migraines while working.  (Id. at 76).  Sometimes, when she caught the migraine early enough and took Motrin, she was able to continue working.  (Id.).  Plaintiff was unable to recall whether she had ever left work because of the effects of a migraine headache.  (Id. at 77).

Defendant Leslee Sparrow served as Absence Administrator for Verizon from October 2002 to December 2003.  (Defendants' Statement at ¶ 31).  Her responsibilities included performing that function at the Wilkes-Barre, Pennsylvania office where plaintiff worked.  (Id.).  Sparrow's responsibilities as Absence Administrator included handling calls from absent employees and reporting those calls to Verizon's Absence Reporting Center (ARC).  (Id. at ¶ 32).[6]  During the period relevant to this action, ARC processed employee leave requests under the Family

---

[5]We will refer to the exhibits to defendants' motion for summary judgment as defendants have, by "attachment (letter)."  A citation to an attachment refers to exhibits to that document.

[6]Plaintiff denies this paragraph "as stated," pointing out that fielding calls and reporting absences to ARC was not Sparrow's "sole duty."  (Plaintiff's Statement at ¶ 32).  We note that defendants' statement avers that "Leslee Sparrow's duties *included* fielding calls from employees calling in absent from work and reporting that absence to Verizon's Absence Reporting Center."  (Defendants' Statement at ¶ 32) (emphasis added).  Defendants do not claim that Sparrow's only duty was making these calls.

and Medical Leave Act (FMLA).  (Defendants' Statement at ¶ 33).  ARC handled

requests for FMLA for Verizon employees, as well as intermittent leave for chronic

health conditions.  (Information Guide for FBA South Transition to ARC, Attachment

N to Defendants' Motion for Summary Judgment (Doc. 67) at 1, 11).  When an

employee reports an absence to ARC, ARC "mails to the employee's home address

either: a) an FMLA introductory package for newly reported absences, b) a Personal

Certification form for an absence related to a previously intermittent absence, or c)

an ineligibility letter if the employee is not FMLA administratively eligible."  (Id. at 2).

Employees who were eligible for FMLA leave and had not previously taken such

leave were required to have their health care provider complete an FMLA medical

certification and return the form within twenty-five days to have that absence covered

by the FMLA.  (Id. at 4).  In 2003 if an employee suffered from "a previously reported

intermittent absence" that employee was required to complete and return a personal

certification form.[7]  (Id.).  Employees certified to take intermittent leave were required

to notify their supervisors, who would then call ARC.  (Id. at 11).  The absence was

_____

[7]On June 3, 2003, Verizon's Absence Reporting Center sent such a form to plaintiff regarding her absence that began on May 30, 2003.  In pertinent part, the letter stated that plaintiff had "indicated that your current absence relates to a serious health condition for yourself, for which you have previously submitted a medical certification, and that this absence falls within the period previously certified by the health care provider, and approved by the Absence Reporting Center.  Accordingly, you must complete and return the enclosed Family and Medical Leave Act (FMLA) Employee Certification Form for Chronic Health Conditions or Scheduled Multiple Treatments [to the ARC].  It is your responsibility to ensure that your completed form is received by our office, via fax or mail, by 6/24/2003 (25 days from first day of absence).  (Attachment P, Letter to Terri Sconfienza, dated June 3, 2003).

to be "reported as an absence related to an approved intermittent absence."  (Id.).

An employee who failed to "receive either an FMLA package or an FMLA ineligibility

letter within 5 business days from the first day of absence" was required to call ARC

"immediately" to speak with a customer service representative.  (Id. at 5).  An

employee denied FMLA benefits could seek administrative review by filing a request

within fourteen days of the denial letter.  (Id. at 3).  An employee denied benefits for

failing to submit the proper forms within 25 days of the first date of absence had to

submit a completed form and an explanation and documentation for why the forms

were not submitted on time.  (Id.).  The company offered no appeals from this

administrative review.  (Id.).

Defendants monitored employees' attendance through a program called the

Regional Attendance Plan (RAP).  (See Attachment K).  Under the

program,"chargeable" absences, paid or not, and tardiness counted against a

worker's record and could lead to disciplinary action.  (Defendants' Statement at ¶

47).[8]  RAP "absences certified as covered by the Family and Medical Leave Act

(FMLA) [we]re not considered chargeable absences and therefore and not subject"

to the program.  (Id. at 1).  Under the plan, chargeable absences that occured on

consecutive days were calculated as "incidents," regardless of their length.

---

[8]Plaintiff points out that no evidence exists to demonstrate that plaintiff saw this document, but plaintiff also does not dispute that the document states the terms of the policy.  Since she does not dispute the authenticity of the document, we will use it to establish the stated terms of the policy.

(Attachment K at 2).  A "chargeable absence" under the RAP was "[a]ny absence, paid or unpaid, which [wa]s recorded and charged against an employee's record for the purposes of determining attendance performance."  (Attachment K at 2).  Such absences could include "non-FMLA covered sickness and disability absences; absence due to transportation difficulties; [or] unexcused time without pay."  (Id.).  "Non-chargeable offenses" were absences "recorded but not charged against an employee's record" of attendance, including absences for "jury duty; military duty; FMLA certified absence; death in immediate family; [and] excused time without pay." (Id.).

For employees like the plaintiff with more than five years of service, the RAP consisted of five "steps" of increasingly severe punishment (Id. at 3).  The last of these steps could lead to termination.  (Id.).  An employee faced advancement to Step 1 of the program for, among other reasons, committing a chargeable incident of absence that exceeded four days or for two chargeable incidents within three months.  (Id.).  Employees on Step 1 met with a supervisor when they returned to work and discussed the absence and the importance of reliable attendance.  (Id.).  Employees working in Pennsylvania were advised that another chargeable incident of absence of less than four days within six months "may result in placement on Step 2" and the next chargeable incident of absence exceeding four days could place that employee on Step 3.   (Id.).  An employee who committed no other chargeable incident of absence for six months would be removed from Step 1.  (Id.).  An

7

employee moved to Step 2 was given a "formal warning" of "unsatisfactory" attendance.  (Id. at 5).  Another incident could lead to a suspension, and the employee was deemed "Does Not Meet Requirements" (DN) in attendance and declared ineligible to participate in the Regional Associate Mobility Plan (RAMP).  (Id.).[9]  As a general matter, "[b]ased on the specific circumstances regarding the employee's absence or tardiness, the supervisor use[d] discretion in determining whether to initiate placement on the plan or progress an employee through the plan."  (Id. at 1).

Plaintiff was certified for intermittent leave due to her migraines between October 22, 2001 and October 22, 2002.  (Defendants' Statement at ¶ 73).  Plaintiff missed three days of work due to her migraines after this certification expired, on November 4, 2002, November 15, 2002, and December 12, 2002.  (Attachment S at 1-2).[10]  Plaintiff submitted an FMLA Certification form on November 20, 2002.  (Defendants' Statement at ¶ 75).  The form sought FMLA certification for the two absences in November and certification for future intermittent leave due to plaintiff's migraines.  (Id.).  Dr. Kovalick completed this form.  (Id.).  The document certified that plaintiff had recently missed work due to her migraines, and explained the

---

[9]Because there are no allegations in this case that plaintiff ever progressed beyond Step 2 of the RAP, we will not discuss in detail the program beyond the second step.  We note only that discipline becomes increasingly severe with each step, culminating in possible termination at Step 5.

[10]This document is not paginated, but the information in question is contained on the first two pages of the material.

8

treatment she had received for the condition.  (Attachment U).  The document also

informed defendants that plaintiff suffered from a "Chronic Condition Requiring

Treatment," but did not contain any of the information the form sought about the

treatment required for this chronic condition.[11]  (Id.).  Dr. Kovalick also requested

intermittent leave for the plaintiff; she expected the plaintiff to be unable to work six

times per month over the next year due to her condition.  (Attachment U).  After

examining the certification submitted by plaintiff's doctor, defendants sought more

information about her illness and treatment.  (See Attachment V and Attachment W).

Dr. Lewis Miller, who worked for ARC, faxed Dr. Kovalick on February 20, 2003 with

a request that she phone him to "clarify the treatment for [plaintiff's ] condition as well

as the estimated frequency/duration of her future absences."  (Attachment W).  Dr.

Kovalick spoke with Dr. Miller about her treatment of plaintiff, probably on February

20th or 21st, 2002.[12]  (Deposition of Dr. Kovalick, (hereinafter "Kovalick Dep.")

---

[11]The parties dispute the significance of this omission.  Defendants contend that "[t]o the extent it sought certification for intermittent leave, this FMLA Certification Form was incomplete because Dr. Kovalick failed to include any information regarding the treatment that Plaintiff required for her chronic health condition."  (Defendants' Statement at ¶ 76).  Plaintiff argues that she never received information from Verizon that the form she submitted was incomplete, and that documents supplied by defendants indicate they never sent her such a form.  (Plaintiff's Statement at ¶ 76).  Both parties appear to be correct in that the documents say what the parties insist they do.  We fail to see, however, how the defendants' characterization of the document is incorrect.  In any case, the very form to which plaintiff points as evidence that defendants did not contact plaintiff about the incomplete form reveals that they contacted plaintiff's physician to address issues with the form.  (See Attachment W).

[12]Dr. Kovalick recalled speaking with Dr. Miller, but could not recall the exact date of her conversation.  (Kovalick Dep. at 102).  In her deposition, however, Kovalick acknowledged that plaintiff's medical file contained a notation from February 21, 2002 with

9

attached as Exhibit 11 to Plaintiff's Brief in Opposition to Defendants' Motion for Summary Judgment (Doc. 71) (hereinafter "Plaintiff's Brief") at 102-103).  The physicians discussed plaintiff's treatment, and Dr. Kovalick recalled that "it was a phone call questioning the care . . . I was giving the patient, regarding her migraines, questioning the filling out of my forms." (Id. at 104).   Part of this conversation included a suggestion from Dr. Miller that Dr. Kovalick adjust the frequency of migraines cited on the FMLA form.  (Id. at 115).  Dr. Kovalick did not reject this proposal immediately or insist that her diagnosis of a need for six absences per month due to migraines was appropriate; she instead told Dr. Miller she would discuss the matter with the plaintiff.  (Id. at 115-16).   During this conversation, Dr. Kovalick found Dr. Miller rude and demeaning in the way he questioned her treatment of the plaintiff.[13]  (Defendants' Statement at ¶ 84).

Verizon approved plaintiff's three absences due to her migraines in November and December 2002 for FMLA leave on February 27, 2003.  (Attachments T, Y, Z, AA).  On that date, Verizon decided to "approve absence only" for FMLA leave "until clarification can be obtained from the employee's H[ealth] C[are] [P]rovider"

---

an instruction to call plaintiff and tell her that she had spoken with the doctor from her workplace about plaintiff's request for a certification.  (Id. at 102-103).

[13]When asked at her deposition how Dr. Miller's harassed her, Dr. Kovalick explained that he did so "[b]y the questioning of care, as I mentioned before.  The frequency of the time that I had Terri off, with the forms."  (Kovalick Dep. at 130).  In elaborating, she explained "[i]t was the way that he went about it, as I recall, and I don't remember the exact wording.  It was the tone, it was the way he presented the questions, it wasn't a colleague to colleague discussion."  (Id. at 130-31).

regarding certification for her intermittent leave request.[14]  (Attachment W).  Dr.

Miller continued to phone Dr. Kovalick in an attempt to clarify the issues in plaintiff's

certification.  (Id.).  On March 7, 2003, Dr. Miller telephoned Dr. Kovalick; she was

out of the office and he left a message.  (Id.).  When Dr. Miller phoned the next

week, Dr. Kovalick refused to speak with him.  (Id.).  She had her secretary inform

him that she would not speak with him  (Id.; Kovalick Dep. at 123).  Dr. Kovalick

never called Dr. Miller or anyone else at Verizon to clarify her diagnosis about the

frequency of plaintiff's migraine attacks.  (Kovalick Dep. at 124, 126).  Dr. Miller

concluded that the certification for intermittent absences could not be clarified with

plaintiff's Health-Care Provider and decided not to grant the intermittent leave.

(Attachment W).  The record does not indicate, however, whether defendants

informed plaintiff that they had denied her intermittent relief request because the

certification form lacked sufficient information on her treatment or returned the form

to her because it was incomplete.  (Attachment W at 2).

On February 18 and 19, 2003, plaintiff was absent from work due to her

---

[14]Plaintiff disputes the defendants' statement that "on 'February 27, 2003, Verizon approved Palintiff's three absences in November and December of 2002 for FMLA coverage but left the issue of Plaintiff's intermittent leave request open until it got certification from Dr. Kovalick.'" (Plaintiff's Statement at ¶ 85).  We agree that this statement is nowhere in the evidentiary record, since the statement is contained in defendants' statement of undisputed facts.  (See Defendants' Statement at ¶ 85).  We agree with the defendants, however, that information showing that both plaintiff's absences in November and December 2002 for which she sought FMLA leaver were approved on February 27, 2003 and that the employer delayed a decision on certifying plaintiff for intermittent leave until the certification issue was cleared up with the plaintiff's doctor.  We would remind the plaintiff that a statement of fact can be accurate as a summary of facts from the record, even if that summary provides no direct quotation.

migraines.  (Defendants' Statement at ¶ 89; Attachments BB, CC).  Her request for

intermittent leave had not yet been approved.  (See Attachment W).  Plaintiff again

missed work on March 17 and 18, 2003 due to her migraine headaches.

(Defendants' Statement at ¶ 92).  Defendants sent plaintiff an FMLA certification

form on February 19, 2003, resending that form on March 11, 2003.[15]  (Attachments

DD, EE).  The document informed her that she needed to send a completed

certification to ARC by March 15, 2003 to be considered for FMLA leave.

(Attachment DD).  Plaintiff did not return the certification form within this time period,

and defendants denied her FMLA leave for those absences.[16]

Plaintiff missed work on March 17 and 18, 2003, due to another bout with

migraines.  (Defendants' Statement at ¶ 92).  On March 20, 2003 defendants again

---

[15]Defendant contends that the record does not prove plaintiff was sent these certification forms.  (Plaintiff's Statement at ¶ 90).  She also argues that "Sconfienza was charged for absences that should have been approved for FMLA because Verizon had several FMLA Certifications on file."  (Id.).  The documents to which she cites are applications for certification, not certifications themselves.  (See Plaintiff's Exhibits (Doc. 72) at D, E, F).  In other words, they do not state what she contends they state.  (See also Deposition of Kristina Laurito (hereinafter "Laurito Dep."), attached as Exhibit 8 to Plaintiff's Brief in Opposition to Motion for Summary Judgment (hereinafter "Plaintiff's Brief") (Doc. 71) at 168 (where deponent, asked about the significance of such a certification form, testifies that "[i]t is actually the request for certification.  It says her provider is requesting certification from April 21st of 2003 to April 21st of 2004").

[16]Plaintiff denies this assertion, but only because she avers that "Sconfienza was charged for absences that should have been approved for FMLA leave because Verizon had several FMLA Certifications on File."  She cites to the same evidence discussed in note 15, *supra*.  As discussed above, that evidence merely shows that plaintiff filed certifications for earlier absences, not that she had been approved for FMLA leave for the absences in question here.

sent an FMLA certification form to plaintiff.[17]  (Id. at ¶ 93; Attachment GG).  They

repeated this action on March 25, 2003.  (Id.; Attachment HH).  Sometime around

March 25, 2003, defendants gave plaintiff an Employee Discussion Document that

informed her she had been placed on Step 1 of the RAP due to her absences that

began February 18 and March 17, 2003.[18]  (Defendants' Statement at ¶ 94).  The

document plaintiff received informed her that if she returned the certification forms

for these absences and her FMLA was approved, she would be removed from Step

1 of the RAP.  (Defendants' Statement at ¶ 95; Attachment JJ).  On April 15, 2003,

the defendants denied plaintiff FMLA leave because she had not timely filed a

certification form; her absence then became chargeable under the RAP.[19]

(Defendants' Statement at ¶ 96).

Plaintiff missed work due to her migraines on April 21 and 22, 2003.

(Defendants' Statement at ¶ 97).  For this absence, plaintiff returned a completed

FMLA certification form and a request for intermittent leave, completed and signed

by Dr. Kovalchik on May 2, 2001.  (Id. at ¶ 98).  Dr. Kovalick indicated she expected

---

[17]Plaintiff raises the same objections to the facts of this absence as she did for the previous absence.  For the reasons articulated in note 15, *supra*, we find her objections unavailing.

[18]Plaintiff contends that the date she received this document is "in dispute," but offers no evidence to contradict defendants' claim.  (Plaintiff's Statement at ¶ 94).  She does not deny that she received the document.

[19]Plaintiff contends that she had filled out certifications, and that defendants had these certifications on file.  For the same reasons discussed in note 15, *supra*, we find that the evidence in this case does not support plaintiff's claim.

13

plaintiff to miss work three times a month due to her migraines in the next year.  (Id. at ¶ 99).  She expected each absence to last three days.  (Id.).  The company approved FMLA leave for this absence that began on April 21, 2003 and approved plaintiff's request for intermittent leave between April 21, 2003 and April 21, 2004. (Id. at 100; Attachment LL).[20]  The document sent the plaintiff informed her that "if during the certification period, you are absent from work for this reason, you must contact on the first day of your absence and select the appropriate prompt.  If you meet the FMLA eligibilty requirements, the Absence Reporting Center will send the Family and Medical Leave Act (FMLA) Employee Certification Form for Chronic Health Conditions or Scheduled Multiple Treatments that you must complete.  It is your responsibility to ensure the completed form is received by our office by 25 days from the first day of absence."  (Id.).

Plaintiff missed work from May 30 to June 2, 2003 due to migraine headaches.  (Defendants' Statement at ¶ 101).  Defendants sent plaintiff a Personal Certification Form on June 3, 2003.  (Id. at ¶102).  This document informed the plaintiff that she needed to complete and return the form within twenty-five days,

---

[20]The document in question, mailed May 19, 2003 states that "Your absence to care for your self for the period indicated above [April 21, 2003] has been approved for Family and Medical Leave Act (FMLA) leave.  After review of the medical documentation provided by the treating health care provider, your FMLA leave has been approved for the certification period beginning 04/21/2003 to 04/21/2004 with a probable frequency of 3 (Chronic Health Condition) episodes per month.  The probable duration of each episode of incapacity will be 2 days."  (Attachment LL).  Plaintiff contends that she already had "FMLA leave approved based on her Certification forms that she filed in September, October and November 2002."  Plaintiff again confuses the filing of a form with approval of that form, and presents no evidence that the forms she filed had ever been approved.

warning her that "[f]ailure to comply with the above stated requirements may result in denial of FMLA leave, and therefore, the absence may be subject to the provisions of the established attendance plan and practices in your area." (Attachment MM). Plaintiff denies she ever received this form. (Plaintiff's Affidavit, attached as Exhibit 7 to Plaintiff's Brief at ¶ 9) (claiming that "I did not receive any personal certifications that I did not submit back to Verizon in the necessary time requirement."). Because defendants did not receive the required form within twenty-five days, they determined that plaintiff's absence was chargeable under the RAP. (Defendants' Statement at ¶ 103; Attachment OO).

Plaintiff similarly missed work due to her migraines on June 9 and 10, 2003, June 17, 2003 and July 7 and 8, 2003. (Defendants' Statement at ¶¶ 104, 107, 110). The defendants sent the plaintiff an FMLA personal certification form for each incident. (Id. at ¶¶ 105, 108, 111). Plaintiff claims she never received these forms. (Plaintiff's Affidavit at ¶ 9). Because the defendants did not receive personal certification forms for these absences, they concluded the absences were chargeable under the RAP. (Defendants' Statement at ¶¶ 106, 109, 112).

Plaintiff missed a half day of work on July 23, 2003. (Defendants' Statement at ¶ 113). The facts are unclear as to whether plaintiff's migraines caused that absence. (Id. at ¶ 114). The ARC apparently told Defendant Sparrow to record this absence as a new one, not one that grew out of plaintiff's migraine condition. Sparrow could not explain why ARC made this change. (Deposition of Leslee

15

Sparrow, attached as Exhibit 8 to Plaintiff's Brief (hereinafter "Sparrow Dep.") at 77-78).  Company absence records designate this absence as "New Absence, Related to Previously Called in Absence."  (Attachment CC).  Another supervisor, Kristina Laurito, testified that she believed that plaintiff had informed defendants that her absence was unrelated to her previous illness, but did not know why the absence was designated as it was.  (Laurito Dep. at 180-81, 186).  Plaintiff did not request or return an FMLA certification for this absence, and the half-day absence was charged to her under the RAP.  (Defendants' Statement at ¶ 115).

Plaintiff had three chargeable absences in May and June.  (Defendants' Statement at ¶ 116).  She also had two absences for which no FMLA determination had been made.  (Id.; Attachment WW).  This situation led Laurito to initiate discussions with plaintiff about her status under the RAP.  (Id.).  When Laurito confronted plaintiff about her failure to submit the required certification forms, plaintiff informed her that she had not received the forms because ARC had an address for her at which she could not receive mail.  (Defendants' Statement at ¶ 117; Attachment WW; Laurito Dep. at 141-42; Plaintiff's Statement at ¶¶ 103, 110, 113, 115 117).  Plaintiff told Laurito that she could not charge her address with ARC because she needed to maintain the address on file for "tax purposes."  (Attachment WW).  Since ARC did not have plaintiff's proper address on file, Laurito informed her that she would have to make a separate request to ARC to send a certification form

16

to an address where she could receive mail each time she sought FMLA leave.[21]

(Defendants' Statement at ¶ 124).  Plaintiff responded that she did not think it her

responsibility to make a request for every absence.[22]  (Defendants' Statement at ¶

125; Laurito Dep. at 141, 143-44).  Instead, plaintiff asked that Sparrow request the

forms be sent to another address for her; Laurito informed her that only plaintiff had

the authority to request the form be sent to an address not on the company's record.

(Defendants' Statement at ¶ 125; Attachment YY).  Plaintiff claims that she

contacted ARC after each of her absences between May and July to request that

forms be sent her at a different address, but no evidence exists to prove that plaintiff

ever made these contacts.[23]  (Defendants' Statement at ¶ 121, Attachment YY;

Attachment WW at 3).  Plaintiff claimed to Laurito that she had requested review of

her FMLA denials.   (Attachment  WW).

---

[21]The plaintiff denies this averment, but does not cite to evidence in the record that supports her claim.  (Plaintiff's Statement at ¶ 124).  She cites simply to "Exhibit B," but does not explain to which document "Exhibit B" points.  (Id.).  Exhibit B to plaintiff's statement of facts contains a number of handwritten letters from the plaintiff on various topics.  She does not point to a particular letter or explain how any of these letters contradict defendants' statement.  Indeed, this material appears to refer to earlier absences, not the May and June absences.  The magistrate judge noted that on this matter "the plaintiff, not for the first time, cites to the corpus of a deposition transcript without specifying even the page on which her evidence is supposedly found."  (Report and Recommendation (Doc. 81) at 20 n.12).

[22]Plaintiff denies this averment, claiming she had frequently called ARC, but she offers no evidence in support of those claims.  (Plaintiff's Statement at ¶ 125).

[23]Plaintiff denies this claim, insisting that she had contacted ARC several times.  (Plaintiff's Statement at ¶ 121).  She points only to "Exhibit B."  The same problems with this citation apply to the citation discussed in note 21, *supra*.

Prior to meeting with plaintiff to discuss her absences, Defendant Sparrow had

prepared a document, dated July 31, 2003, which purported to place plaintiff on Step

2 of the RAP.[24]   (Defendants' Statement at ¶ 116; Attachment VV).   Defendants

decided not to issue this document because they had discretion on whether to

---

[24]The parties dispute whether this document was ever issued.  The document appears to have been delivered to the plaintiff; it bears signatures of plaintiff's union representative and team leader.  (See Attachment VV).  Defendants claim they prepared the document, but never issued it.  (Defendants' Statement at ¶ 116).  They instead decided to allow Laurito to handle the problem.  (Id.).  Laurito claimed in her deposition that she did not issue the document.  (Laurito Dep. at 151-2) (See Id. at 152-53) (stating in describing the document in question:  "There is a discussion document that was written up prior to placing Terri on Step 2 that was provided to Elaine Fisher.  Elaine Fisher gave it to me and at that point is when I started investigating this and talking to Terri about this.  Terri was never placed on Step 2.  She was never placed on Step 2 because she said she wasn't get her forms and I wanted to give her the benefit of the doubt.  She had enough chargeable absences to be placed on Step 2 or greater but that was not done.  She was not disciplined.").  There is other evidence that buttresses this claim.  An employee discussion document, dated September 15, 2003, describes the intention to place plaintiff on Step 2, but notes that "Employee not advanced to Step 2, per Labor Relations contract R. Heimberger.  Discipline will be postponed while efforts are made to ensure employee is able to receive FMLA paperwork."  (Attachment GGG).  An "Associate Performance Appraisal Plan," covering the period from January 1, 2003 to December 31, 2003, locates plaintiff on Step 1 of the RAP plan.  (Attachment ZZ).  An employee discussion document, dated August 22, 2003, describes a conversation with the plaintiff about her attendance and the problems plaintiff had in acquiring the required certification forms for her absences.  (See Attachment WW).  The form, prepared by Christina Laurito, notes that "I advised Terri that the matter was being investigated by myself and Leslee Sparrow, and that my supervisor was also aware of the situation, and that she would remain on Step 1 until I had enough information to determine what step she should be on." (Id.)  If plaintiff had been placed on Step 2 of the RAP in September 2003, by the rules of the program she would have still remained on Step 2 at the end of 2003.  Her year-end performance evaluation placed her on Step 1.  (See Defendants' Statement at ¶ 132; Plaintiff's Statement at ¶ 132).  Plaintiff contradicts this claim, citing to Sparrow's deposition.  (Plaintiff's Statement at ¶¶ 116, 126, 127).  Defendant Sparrow did not testify that she gave the document to plaintiff, however.  Instead, she averred that she had prepared the document and sent it to plaintiff's supervisor.  She testified that she had no knowledge of what happened to the document after she sent it.  (Sparrow Dep. at 83-84) .  The plaintiff has not, therefore, offered any evidence to contradict defendants' claim that they never placed plaintiff on Step 2 of the RAP, and we will accept that statement of fact.

advance employees on the RAP, and they saw their action "as a concession to Plaintiff's stated difficulties with receiving forms." (Defendants' Statement at ¶ 126). Plaintiff has never moved beyond stage one of the RAP.[25] (Id. at ¶ 127).

Indeed, plaintiff was ultimately removed from Step 1 of the RAP. (Id. at ¶129). Her chargeable absences never led to any suspension from work time. (Id. at ¶131). Plaintiff apparently took excused work days ("e-time") and vacation days at some point in 2003 because she worried about being terminated for her absences she feared could not be covered by FMLA. (Defendants' Statement at ¶ 134, Plaintiff's Deposition (hereinafter "Plaintiff's Dep."), included as Attachment B to Defendants' Statement at 285; Plaintiff's Statement at ¶¶ 101, 105, 111, 114, 138). She does not provide any dates for the days on which she took vacation days or e-time.[26] The evidence indicates that plaintiff may not have been paid for every day of e-time she took, though plaintiff's own testimony contradicts itself. (Defendants' Statement at ¶ 138, Plaintiff's Statement at ¶ 138; Compare Plaintiff's Affidavit at ¶ 10 with Plaintiff's Dep. At 91, 101-102). If plaintiff had been approved for FMLA leave she

---

[25]For the same reasons as in note 24, *supra*, we reject the plaintiff's claims disputing this statement.

[26]Plaintiff claims that she could introduce a payroll administrator at trial to confirm the days plaintiff took such vacation. (Plaintiff's Statement at ¶¶ at 135-36). For a summary judgment motion, however, a party must point to evidence already in the record. Since the plaintiff cannot do so here, we must conclude that no evidence exists to support this claim.

would not have had to use this e-time.[27]  (Plaintiff's Statement, Plaintiff's Affidavit at ¶ 10).  She never sought treatment for emotional distress because of the actions of defendants.  (Defendants' Statement at ¶ 143).  Plaintiff disputes this contention, but cites to no evidence, claiming only that she had discussed her problems at work with Dr. Kovalick.  (Plaintiff's Statement at ¶ 143).

Plaintiff received a rating of "meets requirements" (MR) for her dependability rating on her year-end performance evaluation in 2002.  (Defendants' Statement at Attachment G at 4).  This rating included an evaluation of plaintiff's attendance.  (Id.).  The defendants made the same determination at the end of 2003.  (Defendants' Statement at ¶ 132; Plaintiff's Statement at ¶ 132).  At the time of this rating, plaintiff had been placed at Step 1 on the RAP.  (Id.).   During 2003, plaintiff received an MR rating every month but July.  (Attachment ZZ at 7).  In that month, she received a rating of "does not meet position requirements" (DN).  (Id.).  For the year, plaintiff received an overall rating of "improvement needed to meet position requirements" (IN).  (Id.).  This rating was based on her ability to meet productivity and quantity requirements.  (Id.).  In 2004, defendants gave plaintiff an MR rating for dependability in each month.  (Attachment CCC at 4, 7).  Her overall rating of DN came because of problems with productivity and quantity requirements.[28]  (Id.).

---

[27]Defendants dispute this claim, but the evidence they cite does not support their contention.  (Defendants' Statement at ¶ 130).

[28]Indeed, this document noted that plaintiff was at Step 0 on the company's "Attendance and Punctuality Plan" (Attachment CCC).

Plaintiff frequently called in absences to Defendant Sparrow.  When she did so, Sparrow "would always have an attitude" with her and "be nasty to" her. (Attachment B at 170).  Sparrow would "make rude comments . . . like, oh, what is your day off this week[?]" (Id.).  Sparrow would also tell her that "just in case you're not planning on coming in I thought you might like to know your day off is such and such."  (Id. at 171).  Plaintiff also complained that "management" made frequent calls on days she had called in sick, "wanting to know if I planned on coming to work the next day."  (Id.).  She found the calls so frequent and annoying that she "just made this rule, you know, one phone call a day with them and that's it, after that the answering machine goes on."  (Id. at 172).  Plaintiff found this behavior "so out of control."  (Id.).

Plaintiff also complained about her employer's actions when she was ill: "[t]hey came to my home when I call off sick under the guise of bringing me a get well card." (Id.).  In August 2005 a Verizon representative came to her home after she had gallbladder surgery.  (Id. at 173).  Plaintiff was not aware of the person who had come to her home "because they never rang my doorbell and they never knocked on the door."  (Id.).  She did receive a card, however, signed by two office managers. (Id.).  Plaintiff had previously seen these two managers "leave on their little get well visits" together.  (Id.).  Plaintiff could not remember another occasion in the fifteen years she had worked for Verizon that she had received such a get-well visit.  (Id. at

174-75).[29]

On February 8, 2005, plaintiff filed a complaint in this court.  (See Complaint (Doc. 1)).  The first count of the complaint alleged violations of the Americans with Disabilities Act (ADA), 42 U.S.C. §§ 12101, et seq., for discrimination, harassment, and failure to accommodate.  (Complaint at ¶¶ 24-25).  The second count alleged a violation of the Pennsylvania Human Relations Act (PHRA), 43 Pa. Const. Stat. §§ 955, et seq., based on the same grounds as the ADA claim.  (Id. at ¶ 27).  In count III, the plaintiff sought individual liability against Defendant Sparrow under the PHRA for "aiding and abetting" Verizon's alleged discriminatory practices, harassment, and retaliation.  (Id. at ¶ 29).  Count IV alleged that Verizon had violated the Family and Medical Leave Act, 29 U.S.C. §§ 2601, et seq., by interfering with her right to take leave and retaliating against her for taking leave protected by the Act.  (Id. at ¶ 31). Plaintiff sought damages of "back pay, front pay, emotional distress, embarrassment, humiliation, attorney fees, costs, expenses, pre-and post-judgment interest, delay damages, letters of good reference, reformation of Plaintiff's employment records, employment benefits, and other such legal and equitable relief as allowable at law." (Id.).

Plaintiff filed objections to the report and recommendation (Doc. 84) on

---

[29]Plaintiff also contends that her employer engaged in surveillance through private detectives: "they brag how they have hired private investigators to follow us around when we call off sick."  (Attachment B at 176).  She could not describe an instance where she knew she had been followed.  (Id.).

February 5, 2007.[30]  The parties then filed briefs in response to those objections, bringing the case to its present posture.

**Jurisdiction**

Because this case raises claims under the ADA and FMLA, this court has jurisdiction under 28 U.S.C. § 1331.  ("The district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States.").  We  have supplemental jurisdiction over the plaintiff's claims under the PHRA pursuant to 28 U.S.C. § 1367.

**III.  Legal Standard**

---

[30]We note that some of the plaintiff's objections fail to follow Local Rule 72.3, which requires that a plaintiff file "written objections which shall specifically identify the portions of the proposed findings, recommendations or report to which objection is made and the basis for those objections."  L.R. 72.3.  For instance, the plaintiff "objects to the Report in its entirety since it is allowing Verizon to penalize an employee for taking FMLA leave/requesting accommodation and complaining about the same as long as it does not rise to the leave [sic] of suspension."  (Plaintiff's Objection to the Report and Recommendation of Magistrate Judge Malachy E. Mannion (Doc. 84) at ¶ 1).  We cannot evaluate this type of objection, since the plaintiff does not offer any specific reasons why the report and recommendation fails.  Similarly, plaintiff complains that the report "does not view the evidence [in the light] most favorable to" the non-moving party, as required for summary judgment.  (Id. at ¶ 2).  While certainly failure to follow the legal requirements for deciding summary judgment is grounds for objecting to a report and recommendation, an approach more useful for this court would be to object to specific recommendations, and then point to the court's failure to read the evidence in a proper fashion or to credit evidence which creates an issue of fact.  As written, the objections (and the brief that supports them) are too general and not focused squarely enough on the particular recommendations of the magistrate judge to be as useful as they should be in making our determination.  We recognize, however, that defendant objects to each of the magistrate judge's determinations that are dispositive, and we will address them in turn, using plaintiff's mostly general arguments to flesh out her objections.  In the future, however, we urge plaintiff's attorney to focus her objections on the magistrate judge's specific recommendations, rather than on general complaints about how the report uses evidence or applies the law.

23

In disposing of objections to a magistrate judge's report and recommendation, the district court must make a *de novo* determination of those portions of the report to which objections are made.  28 U.S.C. § 636 (b)(1)(C); see also Henderson v. Carlson, 812 F.2d 874, 877 (3d Cir. 1987).  This court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The district court judge may also receive further evidence or recommit the matter to the magistrate judge with instructions. Id.

When no objections to the report and recommendation have been filed, in order to decide whether to adopt the report and recommendation, we must determine whether a review of the record evidences plain error or manifest injustice. See, e.g., Sullivan v. Cuyler, 723 F.2d 1077, 1085 (3d Cir. 1983); FED. R. CIV. P. 72(b) 1983 Advisory Committee Notes ("When no timely objection is filed, the court need only satisfy itself that there is no clear error on the face of the record to accept the recommendation"); 28 U.S.C. § 636(b)(1).

The case comes before this court on motions for summary judgment. Granting summary judgment is proper if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.  See Knabe v. Boury, 114 F.3d 407, 410 n.4 (3d Cir. 1997) (citing FED. R. CIV. P. 56(c)). "[T]his standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise

properly supported motion for summary judgment; the requirement is that there be

no <u>genuine</u> issue of <u>material</u> fact." <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242,

247-48 (1986) (emphasis in original).

In considering a motion for summary judgment, the court must examine the

facts in the light most favorable to the party opposing the motion. <u>International Raw</u>

<u>Materials, Ltd. v. Stauffer Chemical Co.</u>, 898 F.2d 946, 949 (3d Cir. 1990). The

burden is on the moving party to demonstrate that the evidence is such that a

reasonable jury could not return a verdict for the non-moving party. <u>Anderson</u>, 477

U.S. at 248 (1986).  A fact is material when it might affect the outcome of the suit

under the governing law. <u>Id.</u>  Where the non-moving party will bear the burden of

proof at trial, the party moving for summary judgment may meet its burden by

showing that the evidentiary materials of record, if reduced to admissible evidence,

would be insufficient to carry the non-movant's burden of proof at trial. <u>Celotex v.</u>

<u>Catrett</u>, 477 U.S. 317, 322 (1986).  Once the moving party satisfies its burden, the

burden shifts to the nonmoving party, who must go beyond its pleadings, and

designate specific facts by the use of affidavits, depositions, admissions, or answers

to interrogatories showing that there is a genuine issue for trial. <u>Id.</u> at 324.

## IV.  Discussion

Plaintiff objects to the entire report and recommendation in this case.  In the

interest of efficiency, and because plaintiff's objections are material only insofar as

they would cause us not to adopt one of the magistrate judge's recommendations,

we will address each of the magistrate judge's recommendations in turn.[31]  We will

incorporate plaintiff's objections and argument into our discussion of these

recommendations.

## A. Discrimination under the ADA and PHRA

The plaintiff objects to the magistrate judge's recommendation that we dismiss

her claims under the ADA and PHRA that defendants discriminated against her

because of her disability by refusing to offer her a reasonable accommodation that

would have allowed her to perform her job.

The purpose of the Americans with Disabilities Act is to "provide a clear and

comprehensive national mandate for the elimination of discrimination against

individuals with disabilities."  42 U.S.C.A. § 12101 (b)(1).  Under the ADA, an

employer cannot discriminate against a qualified individual with a disability because

of that disability in regard to her employment.  42 U.S.C.A. § 12112 (a). Further, an

employer must make reasonable accommodations to known physical or mental

---

[31]Plaintiff apparently finds error in the weight that the Magistrate Judge gave testimony from William Sonnick and Vicki Kintzer, witnesses deposed by the plaintiff who worked for Verizon and who handled FMLA claims.  (See Plaintiff's Brief at 21-24).  Plaintiff complains that Magistrate Judge Mannion never cited to their testimony in his decision, though she contends their testimony would be useful.  The testimony to which plaintiff points, however, is testimony that constitutes legal conclusions, such as the fact that "Sonnick and Kintzer both agreed that Verizon harassing employees' doctors into changing FMLA forms, refusing to provide blank FMLA forms, not correcting Verizon's errors, and disciplining employees interferes with an employees' FMLA rights." (Id. at 21).  This sort of testimony constitutes legal conclusions that are not appropriate for fact witnesses.  We do not find that the magistrate judge's failure to cite to this testimony for the purpose sought by plaintiff provides us with a reason to reject any of the magistrate judge's recommendations.  Assigning legal meaning to facts is the province of the court.

limitations of an otherwise qualified employee with a disability unless such employer can demonstrate the accommodation would impose an undue hardship on the operation of the employer's business.   Id.;  see also Taylor v. Phoenixville Sch. Dist., 184 F.3d 296, 306 (3d Cir. 1999) (holding that "[d]iscrimination under the ADA encompasses not only adverse actions motivated by prejudice and fear of disabilities, but also includes failing to make reasonable accommodations for a plaintiff's disabilities.").  Our analysis under the ADA applies equally to plaintiff's claims under the PHRA.  See Kelly v. Drexel Univ., 94 F.3d 102, 105 (3d Cir. 1996).

The plaintiff has the initial burden in an ADA matter of establishing a *prima facie* case.  Olson v. General Elec. Astrospace, 101 F.3d 947, 951 (3d  Cir. 1996); Newman v. GHS Osteopahtic, Inc., 60 F.3d 153, 157 (3d Cir. 1995).  A *prima facie* case is established by the plaintiff when she demonstrates: 1)she is a disabled person within the meaning of the ADA; 2) she is otherwise qualified to perform the essential functions of the job, with or without reasonable accommodations by the employer; and 3) she has suffered an otherwise adverse employment decision as a result of discrimination.  Shiring v. Runyon, 90 F.3d 827, 831 (3d Cir. 1996);   Gaul v. Lucent Technologies, 134 F.3d 576, 580 (3d Cir. 1998).

If the plaintiff meets this initial burden, the court then applies the next step in "the familiar burden-shifting framework of McDonnell Douglas Corp. v. Green, 411 U.S. 792, 803-805." Abramson v. William Patterson College, 260 F.3d 265, 281 (3d Cir. 2001).  The burden of production shifts to the employer to "proffer a legitimate,

non-discriminatory reason for the adverse employment decision." Id. at 282.  An employer need only introduce "evidence which, taken as true, would permit the conclusion that there was a nondiscriminatory reason for the unfavorable employment decision." Fuentes v. Pierske, 32 F.3d 759, 763 (3d Cir. 1994).  "The employer need not prove that the tendered reason *actually* motivated its behavior, as throughout this burden-shifting paradigm the ultimate burden of proving intentional discrimination always rests with the plaintiff." Id. (emphasis in original).  Once the employer meets this burden, the plaintiff must show that a jury  "could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating factor or determinative cause of the employer's action." Id. at 764.

The magistrate judge found that plaintiff failed to advance a *prima facie* case of discrimination under the ADA because she not produce any evidence that showed she had experienced an adverse employment decision.  No reasonable factfinder, the magistrate judge decided, could conclude that plaintiff had suffered any action that "seriously and tangibly alter[ed] the conditions of her employment."  (Report and Recommendation (Doc. 81) at 28).  The only substantiated evidence of employment discipline provided by the plaintiff showed that she had been advanced to step one under the RAP.  The Magistrate Judge pointed out that this status under the Verizon plan did not result in an actual penalty, but only a warning about future penalties. That penalty was thus "neither . . . serious nor had any impact on the terms of the

plaintiff's employment." (Id. at 28-29).

We will adopt the magistrate judge's recommendation on this point.  Plaintiff

argues that the magistrate judge erred because he did not recognize that the

question of whether an accommodation is reasonable is customarily left to the jury.

She did not, plaintiff contends, have to show an adverse employment action in order

"to state a claim for failure to accommodate her disability." (Plaintiff's Brief at 39).

Plaintiff is correct that courts have found that "[t]he question of whether a proposed

accommodation is reasonable is a question of fact." Buskirk v. Apollo Metals, 307

F.3d 160, 170 (3d Cir. 2002).[32]  A failure to accommodate can be seen as an

adverse employment action.  See Turner v. Hershey Chocolate U.S.A., 440 F.3d

604, 611 n.4 (3d Cir. 2006) (finding that "the failure to reasonably accommodate a

disabled and qualified employee constitutes an adverse employment action for

purposes of the ADA.").  Plaintiff argues that her requests for leave under the FMLA

were requests for a reasonable accommodation, but cites no law that establishes

that proposition.  In any case, since we agree with the magistrate judge that plaintiff

was not denied any FMLA leave to which she was entitled, plaintiff cannot claim that

the failure of her employer to offer such leave constituted a failure to

---

[32]We note, however, that the court in Buskirk found that the district court did not err
in finding that plaintiff had presented no evidence by which a reasonable juror could find
that defendant had not offered a reasonable accommodation.  Buskirk, 307 F.3d at 170.
The court found that the district court had not erred in granting a Rule 50 motion by the
defendants.  Id.

accommodate.[33]

Plaintiff argues in another portion of her objections that Magistrate Judge Mannion erred in finding that she had not suffered prejudice as a result of being denied absences covered by the FMLA.  Reading plaintiff's objections and brief generously, we could conclude that these complaints constitute a claim that plaintiff suffered an adverse employment action related to her disability.  Plaintiff argues that defendants placed her on Step 2 of the RAP plan, and that this change made her ineligible for transfer or promotion and gave her a lower rating on performance reviews.  We find, however, that there is no evidence that plaintiff was ever actually assigned to step two on the RAP.  The evidence is clear that the defendants considered placing plaintiff on Step 2 of the RAP, but it is also clear that they never did so.  Plaintiff offers no evidence that indicates she was ever placed on Step 2 of the RAP, and she counters none of the several pieces of evidence that show plaintiff at one point was on Step 1, but had been removed from any steps on the program at the time she filed her suit.[34]  Since there was no actual adverse effect of plaintiff's

---

[33]The Seventh Circuit Court of Appeals has determined that "[t]ime off may be an apt accommodation for intermittent conditions.  Someone with arthritis or lupus may be able to do a given job even if, for brief periods, the inflammation is so painful that the person must stay home."  Bryne v. Avon Prods., Inc., 328 F.3d 379 (7th Cir. 2003).  We have not discovered any Third Circuit precedent directly on point, though we find the reasoning of Judge Easterbrook in Bryne convincing.  In this case, unlike Byrne, defendants did offer plaintiff FMLA leave when she followed proper procedure in requesting it.  Defendants cannot be held accountable for failure to accommodate when they actually offered plaintiff all the accommodation she was due.

[34]See n.24, *supra*, for a fuller discussion of this evidence.

assignment to Step 1 on the RAP and plaintiff has offered no evidence of a failure to accommodate, we agree with the magistrate judge that plaintiff has not made a prima facie case of employment discrimination under the ADA and therefore cannot prevail on that claim.  We will adopt the magistrate judge's recommendation and grant defendants summary judgment on this issue.

## B.  Harassment Under the ADA and PHRA

Plaintiff claims harassment under the ADA and PHRA.  To prevail on such a claim under the ADA, she would have to show that "1) [she] is a qualified individual with a disability under the ADA; 2) she was subject to unwelcome harassment; 3) the harassment was based on her disability or a request for an accommodation; 4) the harassment was sufficiently severe or pervasive to alter the conditions of her employment and to create an abusive working environment; and 5) that [the employer] knew or should have known of the harassment and failed to take prompt effective remedial action."  Walton v. Mental Health Ass'n. of Southeastern Pennsylvania, 168 F.3d 661, 667 (3d Cir. 1999).  In this context, "to prove an 'abusive work environment' under Title VII, the environment must be shown to be objectively hostile or abusive, and the plaintiff must have perceived it as a hostile or abusive environment."  Id.  While a plaintiff need not show an injury or severe psychological trauma from her treatment, she must "show that the harassment was 'sufficiently severe or pervasive to alter the conditions of [her] employment and create an abusive working environment.'"  Id. (quoting Harris v. Forklift Sys., Inc., 510

31

U.S. 17, 22 (1993)).

In making a judgment about whether the work environment was hostile or abusive, a court "must consider all the circumstances, including 'the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" Id. (quoting Harris, 510 U.S. at 23); (finding that for a setting to be "hostile or abusive, we must look to numerous factors, including 'the frequency or the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; whether it unreasonably interferes with an employee's work performance.'") (citations omitted).

The magistrate judge concluded that none of the incidents cited by the plaintiff as harassment constituted adverse actions under the law and that summary judgment was therefore warranted on plaintiff's claims.  We agree.  The incidents cited by the plaintiff and the environment that might have been created by those incidents were not "sufficiently severe or pervasive to alter the conditions of her employment and to create an abusive working environment."  Walton, 168 F.3d at 667.  Here, the alleged discriminatory conduct was not frequent, nor was it threatening or humiliating, nor did it interfere with plaintiff's work performance.[35]

---

[35]The magistrate judge addressed four types of harassment alleged by the plaintiff: the "attitude" of plaintiff's supervisor, Defendant Sparrow, when plaintiff called to report an absence, calls by managers to find out when she would return to work during periods of illness, the delivery of the get-well card, and Dr. Miller's conversations with Dr. Kovalick. (Report and Recommendation at 29).  Plaintiff's brief directly addresses only the conversations between Dr. Miller and Dr. Kovalick.  She also addresses, at least by

Plaintiff complains about conversations her doctor had with Dr. Miller, a physician employed by the company who sought to verify her claims for FMLA leave. The company's doctor was neither polite nor respectful to Dr. Kovalick. He called her repeatedly about certification forms Dr. Kovalick was charged with completing. Dr. Kovalick eventually became so frustrated with this behavior that she refused to deal with him. While such behavior may be unprofessional and reprehensible, it is not the type of behavior that constitutes harassment under the ADA or PHRA, especially since plaintiff's doctor, not the plaintiff herself, experienced the objectionable behavior. These conversations had no effect on the plaintiff's job performance, and the aggravation they caused fell on her doctor, not her. In addition, these calls were not made for an abusive reason, but in an attempt to verify that plaintiff qualified for FMLA leave. Despite their rude tone, they were not made for any harassing purpose.

Plaintiff also complains of a visit to her home by supervisors seeking to leave her "get well" cards when she missed work. She uses the phrase "drive-by get well" to describe defendants' efforts to provide plaintiff with comfort when she fell ill.

---

implication, the delivery of the get well card. We could therefore conclude that plaintiff makes no objection to the magistrate judge's findings on the two other issues. Even if we were to conclude that an objection exists, we would still adopt the magistrate judge's findings on these matters. None of the evidence concerning calls from a supervisor about absences or attempts by other supervisors to coordinate schedules by finding out about an employee's availability constitute behavior so frequent, severe or humiliating that a reasonable juror could find defendants' behavior hostile or abusive.

Supervisors apparently went to plaintiff's home and left her a card wishing her well.[36] They did not knock on her door, ring her bell, or in any way attempt to discern whether she was at home.  This visit occurred only once, and plaintiff never saw the supervisors leave the card.  We fail to see how leaving a card for an employee who recently had surgery without knocking on that employee's door or disturbing her in any way can count as behavior that would lead any reasonable person to feel threatened or humiliated.[37]  We will therefore adopt the magistrate judge's recommendation that we grant defendants' summary judgment motion on plaintiff's harassment counts under the ADA and PHRA.

## C.  Violation of the FMLA

The plaintiff objects to the magistrate judge's recommendation that we grant defendants summary judgment on her claims under the FMLA.  The Family and Medical Leave Act (FMLA), 29 U.S.C. §§ 2601, *et seq.*, attempts to "balance the demands of the workplace with the needs of families" by allowing workers "to take reasonable leave for medical reasons, for the birth or adoption of a child, and for the

---

[36]We note that the only instance of such a visit of which plaintiff complains was connected to her August 2005 gallbladder surgery, an incident unconnected to her requests for leave.

[37]While we recognize that sending supervisors to workers' homes when they call in sick could have a motive rooted in surveillance, the fact that the supervisor did not ring the doorbell or disturb plaintiff in any way during this visit convinces us that this alleged "get-well drive-by" is not the sort of behavior that gives rise to a harassment claim.  Indeed, use of the term "get well drive-by" to describe a fairly innocuous practice is evidence of plaintiff's penchant for assigning a significance to defendants' actions out of proportion to their reasonable meaning.

care of a child, spouse, or parent who has a serious health condition" and simultaneously "accommodat[ing] the legitimate interests of employers." 29 U.S.C. § 2601(b)(1-3).  Under the act, "[e]ligible employees 'shall be entitled to a total of twelve workweeks of leave during any twelve-month period' if the employee has a 'serious health condition that makes the employee unable to perform the functions of the position of such employee.'" Callison v. City of Philadelphia, 430 F.3d 117, 119 (3d Cir. 2005) (quoting 29 U.S.C. § 2612(a)(1)(D)).  An employee who takes a "qualified absence" has a right to reinstatement "to the former position or an alternate one with equivalent pay, benefits and working conditions." Id. (citing 29 U.S.C. § 2614(a)(1)).  An eligible employee is entitled to twelve weeks of FMLA leave per year "for medical reasons, for the birth or adoption of a child, and for the care of a child, spouse, or parent who has a serious health condition." Victorelli v. Shadyside Hosp., 128 F.3d 184, 186 (3d Cir. 1997); Ragsdale v. Wolverine World Wide, Inc., 535 U.S. 81, 86 (2002).

The Act makes it "unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided" by the FMLA.  29 U.S.C. § 2615(a)(1).  An employee who alleges that an employer "interfered" with his rights under the FMLA "needs only to show that he was entitled to benefits under the FMLA and he was denied them." Callison, 430 F.3d at 119.  An employee is not charged with proving discrimination under the act, and an employer cannot refute those charges by claiming a "legitimate business purpose" for its decisions: "an

interference action is not about discrimination, it is only about whether the employer provided the employee with the entitlements guaranteed by the FMLA." Id. at 119-20.  Therefore, no burden shifting analysis is required for a plaintiff to prevail. Sommer v. Vanguard Group, 461 F.3d 397, 399 (3d Cir. 2006).  Interference can occur "'not only [by] refusing to authorize FMLA leave, but [by] discouraging an employee from using such leave.'" Id. (quoting 29 C.F.R. § 825.220(b)).  An employer who violates this interference provision "may be found liable for civil damages that include: compensatory damages for any wages, salary, employment benefits or other compensation lost by reason of the violation; and liquidated damages." Id.  (citing 29 U.S.C. § 2617(a)(1)(A)).  That provision, however, "provides no relief unless the employee has been prejudiced by the violation: the employer is liable only for compensation and benefits lost 'by reason of the violation,' [citation omitted], for other monetary losses sustained 'as a direct result of the violation,' [citation omitted], and for 'appropriate equitable relief, including employment, reinstatement, and promotion. [citation omitted].  The remedy is tailored to the harm suffered." Ragsdale, 535 U.S. at 89.

The magistrate judge concluded that defendants did not interfere with plaintiff's rights under the FMLA.  The magistrate judge pointed to three bases on which plaintiff's interference claim had been based: defendants' denial of plaintiff's November 20, 2002 intermittent leave request and subsequent communications between Dr. Miller and Dr. Kovalick; the absences that plaintiff took in February and

March 2003 which were charged against her record; and later absences for which plaintiff was denied FMLA leave after defendants had authorized intermittent leave. The magistrate judge concluded that while Dr. Miller's contact with Dr. Kovalick could have constituted interference prohibited by the FMLA, the plaintiff suffered no prejudice from the violation. The second alleged violation, the magistrate judge found, produced no liability under the FMLA because plaintiff failed to submit proper certifications for those absences. In any case, she suffered no prejudice from these absences because the company placed her on step one of the RAP program, which had no actual penalties. In the third instance, the magistrate judge also found that plaintiff had not produced evidence that could survive summary judgment. An employer is entitled under the act to require employees to certify their absences as entitled to FMLA protection. Plaintiff's failure to do so means that she was not denied an FMLA right. In any case, the magistrate judge found, plaintiff suffered no prejudice from the denial of absences.

Plaintiff argues that she need not show any "adverse action" to prove her interference claim under the FMLA. (Plaintiff's Brief at 24). She contends that "the fact FMLA is requested and denied is sufficient to state a cause of action for interference with a workers [sic] right to FMLA."[38] (Id. at 25-26). Here, plaintiff contends, Verizon interfered with her FMLA rights because the company had "on

---

[38]We note that an employee must also show that she was entitled to that FMLA right before she can prevail on a claim of interference. See Callison, 430 F.3d at 119.

file" FMLA certifications for leave, yet on thirteen occasions in 2003 denied plaintiff leave she requested.  (Id. at 26).  Plaintiff was charged with absences for those dates, and those absences, she insists, caused her to be advanced to Step 2 on the RAP.  Plaintiff also contends she suffered other prejudice from Verizon's actions, including denial of her right to twelve weeks of leave under the FMLA; being charged with absences to which she was entitled to FMLA leave; suffering disciplinary action before the status of her leaves under the FMLA was determined; an unspecified "impact" from disciplinary actions on her performance ratings; having to apologize to her doctor for harassment from her employer; and being forced to use "e-time, person and vacation days" to cover absences which should have been protected by the FMLA.  (Id. at 27-28).

We agree with the magistrate judge that plaintiff has offered some evidence of interference with her FMLA rights in defendants' contacts through Dr. Miller with plaintiff's physician, Dr. Kovalick, about plaintiff's November 20, 2002 intermittent leave request.  Under FMLA regulations, an employer is not allowed to contact an employee's physician without obtaining permission from that worker.  See 29 C.F.R. § 825.307(a) (establishing that "If an employee submits a complete certification signed by the health care provider, the employer may not request additional information from the employee's health care provider.  However, a health care provider representing the employer may contact the employee's health care provider, *with the employee's permission*, for the purposes of clarification and

authenticity of the medical certification.") (emphasis added).  The evidence does not indicate that plaintiff gave defendants permission to contact her doctor to clarify the information in this form, and a jury could therefore find that defendants interfered with plaintiff's exercise of her FMLA rights.

An employee must show prejudice from an employers' interference with her FMLA rights, however, to obtain relief for such a claim.  See Ragsdale, 535 U.S. at 89 (finding that the interference provision in the FMLA "provides no relief unless the employee has been prejudiced by the violation.").  Plaintiff claims prejudice because she was forced to use vacation days and "e-time" instead of FMLA leave when defendants did not grant her November 20, 2002 intermittent leave request.  She has not produced any evidence, however, that connects her use of vacation and "e-time" to this incident.  Indeed, plaintiff offers no records to demonstrate when she used the leave in question.  Plaintiff merely asks us to conclude that any vacation or e-time she took after defendants denied these requests resulted from that denial. This unsupported assertion is not evidence by which a reasonable jury could conclude that she suffered prejudice from defendants' denial of FMLA leave.[39]

---

[39]The magistrate judge noted that plaintiff planned to cure this deficiency in her evidence by calling a payroll administrator at trial to testify on these matter "is unavailing [because] plaintiff had an obligation to provide evidence of the specific loss of her wages or benefits during discovery, before the time for dispositive motions had expired."  (Report and Recommendation at 22, n.18).  We agree; summary judgment is decided on the evidence provided the court at the time the motions are filed, not on evidence the non-moving party asserts could potentially be produced later.  See Fed. R. Civ. P. 56(d) (establishing that summary judgment should be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to

The second period of absences with which plaintiff claims defendants interfered occurred in February and March 2003.  Defendants denied these absences because plaintiff failed to submit FMLA certifications for them as required by Verizon.  Company rules mandated that plaintiff submit forms to certify that she had missed work due to her FMLA-approved condition when she missed work for a protected reason.[40]  Plaintiff received certification forms but did not return them as required by that policy.  Plaintiff offers no evidence to prove that she actually returned the required certification forms.  Once plaintiff actually returned a certification form, for absences on April 21 and April 22, 2003, defendants approved plaintiff for leave.  Because plaintiff failed to return the required certification for these absences, we find that she has provided no evidence by which a reasonable juror could find she was denied a right to which she was entitled.  An employer can require that employees complete certain paperwork in order to establish their entitlement to FMLA benefits.[41]  See 29 U.S.C. § 2613(a) (establishing that "[a]n employer may require that a request for leave . . . be supported by a certification issued by a health care provider of the eligible employee[.] . . . The employee shall

---

a judgment as a matter of law.").

[40]See pages 4-6, *supra*, for a detailed discussion of these policies.

[41]This case is like Callison, where the court found that defendant's policies requiring employees home on sick leave to call a hotline when they left home for a medical appointment did not violate the FMLA, since "[nothing] in the FMLA prevents employers from ensuring that employees who are on leave from work do not abuse their leave." Callison, 430 F.3d at 121.

provide, in a timely manner, a copy of such certification to the employer.").

Summary judgment for the defendants is therefore appropriate on this claim.

Third, plaintiff complains that defendants interfered with her FMLA rights by

denying her FMLA leave for absences in May, June and July of 2003, after she had

obtained FMLA certification from Verizon for intermittent absences.  If plaintiff

needed to miss work due to her migraines while she was approved for intermittent

leave, she was supposed to report the absence to a supervisor, who would call ARC

to have an intermittent leave request form sent to the plaintiff.  Plaintiff had to return

the form in order to receive the requested relief.  The absences for which plaintiff did

not receive FMLA leave were absences for which she failed to return the required

forms.  She claims she failed to do so because she did not receive the forms;

defendants mailed them to the address they had on file for her, but plaintiff could not

receive mail at that address.  The failure to receive these forms, however, lies with

the plaintiff, not the defendants.  Defendants made plaintiff aware that she could

receive FLMA forms at an address other than her primary address if she called the

plan administrator and directed the office to send the form to her at an alternate

address.  Plaintiff found this procedure onerous and refused to follow it.  She also

refused to follow a procedure that required she contact the company if she had not

received a certification form within five days of reporting her absence.  Since an

employer has a legal right to institute procedures for verifying an employee's need

for FMLA leave, plaintiff's failure to follow these procedures means that she was not

entitled to any FMLA leave and cannot prevail on an interference claim here.  See

Callison, 430 F.3d at 121.

In this situation, the plaintiff's failure to receive copies of the certification forms

is not the fault of the defendants.  Plaintiff could have received those forms and

completed them if she had simply informed the defendants where to send them.  The

Seventh Circuit Court of Appeals faced similar circumstances in Diaz v. Fort Wayne

Foundry Corp., 131 F.3d 711 (7th Cir. 1997).  In that case, an employee claimed that

he did not have to comply with a company request that he visit a doctor to confirm

the reasons for his FMLA absence because the company sent notice of that

requirement to Indiana, where he formerly resided, and not to Mexico, where he had

relocated for treatment.  Id. at 713-14.  Since the company knew that Diaz was not in

Indiana, sending mail to that address was the equivalent of not sending mail at all.

Id. at 714.  The company responded that the collective bargaining agreement

required that such mail be sent to an employee's last address of record, and that a

signature on the mail implied that defendant had returned from Mexico.  Id.  The

court found that Diaz was not entitled to FMLA leave because he had failed to

comply with the company's justified request for a medical examination, and "the

FMLA does not tell employers how to send notices.  A firm safely may use the

method prescribed by collective bargaining agreements or some other source of

rules."  Id.  Here, Verizon had established a procedure by which an employee

certified for intermittent leave could notify the company she intended to use such

42

leave.  The employee had to complete a certification, and plaintiff failed to do so because she did not provide defendants with a means of supplying her with the form. Defendants were justified in denying plaintiff leave which she did not request through proper channels, and summary judgment on this claim is justified.

Even if we could consider defendants' failure to alter its policy to meet the plaintiff's demands for personal service of certification forms evidence of interference, we would still find that plaintiff had suffered no prejudice from the failure of the company to provide FMLA leave for these absences.  As discussed previously in this section, plaintiff has offered no evidence which we can credit of lost wages or benefits.  She was not advanced beyond Step 1 of the RAP, despite her protestations to the contrary.  Indeed, one of the reasons that defendants chose not to advance plaintiff to Step 2 of the RAP was because of her complaints about failure to receive certification forms.  They chose to avoid assigning disciplinary consequences to the plaintiff because of her difficulties in receiving certification forms.  Defendants should not face liability because they opted not to take punitive action against an employee.  Therefore, since no prejudice therefore resulted from this denial of FMLA leave, summary judgment is warranted on that count.

**D.  Harassment under the FMLA**

The magistrate judge also concluded that plaintiff offered no evidence to support her case for harassment under the FMLA.  The plaintiff was neither denied a right under the act, the magistrate judge found, nor did the defendants violate any of

the plaintiff's rights by attempting to discern whether plaintiff was entitled to leave under the act by requiring her to file certifications.  Any hostility or aggressive attitude from Defendant Sparrow was not harassment, either.

Plaintiff objects to this finding, but does not explain the specific grounds for this objection.  Apparently, her position is that her employer's response to requests for FMLA leave and to her illnesses constituted harassment, as did attempts to call her doctor to clarify certifications and efforts to leave her get-well cards.  The Third Circuit Court of Appeals has explained that an employee has "no right in the FMLA to be 'left alone.  Nothing in the FMLA prevents employers from ensuring that employees who are on leave from work do not abuse their leave." Callison, 430 F.3d at 121.  We agree with the magistrate judge that requiring employees to file paperwork to seek leave and to verify the reasons for absences is not harassment, but a necessary part of ensuring that the FMLA leave program works equitably for all involved.  Employers must develop such a system to comply with the law, and plaintiff offers no evidence that Verizon's behavior was so unreasonable as to constitute abuse.  Similarly, communications between the defendants and the plaintiff or defendants' doctor and the plaintiff's doctor were not so abusive that they could be considered harassment under the FMLA.  A company has a right to ascertain whether employees need leave or are using the leave made available to them.  Verizon's behavior in making these inquiries did not constitute harassment.  The attempt to leave plaintiff a get-well card, as explained in section IV. B, *supra*,

also does not constitute harassment.  Accordingly, we will grant summary judgment to the defendants on this issue.

## E.  Retaliation under the ADA and FMLA

Plaintiff objects to the Magistrate Judge's finding that summary judgment should be granted to the defendants on plaintiff's retaliation claims under the ADA and FMLA.  The law provides that to establish a *prima facie* case of retaliation the plaintiff must demonstrate that (1) he was engaged in protected activity; (2) the employer took an adverse employment action after or contemporaneous with the employee's protected activity; and (3) a causal link exists between the protected activity and the discharge.  Abramson v. William Paterson College of New Jersey, 260 F.3d 265, 286 (3d Cir. 2001).

The Third Circuit has explained the remainder of the analysis as follows:

> If an employee establishes a prima facie case of retaliation under the ADA, the burden shifts to the employer to advance a legitimate, non-retaliatory reason for its adverse employment action. Woodson, 109 F.3d at 920 n. 2. The employer's burden at this stage is "relatively light: it is satisfied if the defendant articulates any legitimate reason for the [adverse employment action]; the defendant need not prove that the articulated reason actually motivated the [action]." Id.
>
> If the employer satisfies its burden, the plaintiff must be able to convince the factfinder both that the employer's proffered explanation was false, and that retaliation was the real reason for the adverse employment action. Id.; see also St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 519, 113 S.Ct. 2742, 2753-54, 125 L.Ed.2d 407 (1993) ("It is not enough . . . to disbelieve the employer; the factfinder must believe the plaintiff's explanation of intentional discrimination.") (emphasis omitted); Sheridan v. E.I.

> DuPont de Nemours & Co., 100 F.3d 1061, 1067-68 (3d
> Cir. 1996) (en banc) (explaining how plaintiff may satisfy
> burden), cert. denied, 521 U.S. 1129, 117 S.Ct. 2532, 138
> L.Ed.2d 1031 (1997). The plaintiff must prove that
> retaliatory animus played a role in the employer's
> decisionmaking process and that it had a determinative
> effect on the outcome of that process. Woodson, 109 F.3d
> at 931-35 (discussing proper standard to apply in Title VII
> retaliation case). The burden of proof remains at all times
> with the plaintiff. Id. at 920 n. 2.

Krouse v. American Sterilizer Co.,126 F.3d 494, 500-01 (3d Cir. 1997)

To obtain summary judgment, the employer must show that the trier of fact could not conclude, as a matter of law, (1) that retaliatory animus played a role in the employer's decisionmaking process and (2) that it had a determinative effect on the outcome of that process.  These two factors may be met by establishing the plaintiff's inability to raise a genuine issue of material fact as to either: (1) one or more elements of the plaintiff's *prima facie* case or, (2) if the employer offers a legitimate non-retaliatory reason for the adverse employment action, whether the employer's proffered explanation was a pretext for retaliation.  Id.  at 501.

The Supreme Court recently clarified what actions constitute an adverse employment action in the context of Title VII, and we will apply a similar analysis here.[42]  In Burlington Northern & Santa Fe Rwy. Co. v. Smith, the Court addressed

---

[42]The parties, agreeing that White–though addressing only Title VII–should apply to other retaliation contexts, have briefed the issue.  We will therefore treat the Supreme Court's standard as applicable to this case.  We note that the standard for retaliatory conduct articulated in White applies to a broader range of actions than had the previous standard, and that our decision that plaintiff has not pointed to any conduct that a reasonable jury could find retaliatory would apply if we used the older, perhaps more strict, standard.

46

"whether Title VII's anti-retaliation provision forbids only those employer actions and resulting harms that are related to employment or the workplace" and "how harmful an act of retaliatory discrimination must be in order to fall within the provision's scope." Smith, ___ U.S. ____; 126 S. Ct. 2405, 2411 (2006).  The Court concluded that "the anti-retaliation provision, unlike the substantive provision, is not limited to discriminatory actions that affect the terms and conditions of employment." Id. at 2412.  To demonstrate that an employer's actions violated the act, then, the court held that "a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, 'which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination.'" Id. at 2415 (quoting Rochon v. Gonzales, 483 F.3d 1211, 1219 (D.C. Cir. 2006)).   Anti-retaliation provisions "[seek] to prevent employer interference with 'unfettered access' to Title VII's remedial mechanisms." Id. (quoting Robinson v. Shell Oil Co., 519 U.S. 337, 346 (1997)).  They achieve this end "by prohibiting employer actions that are likely 'to deter victims of discrimination from complaining to the EEOC,' the courts, and their employers." Id. (quoting Robinson, 519 U.S. at 346).  Such protection does not, however, "immunize that employee from those petty slights or minor annoyances that often take place at work and that all employees experience." Id.  "Normally[,] petty slights, minor annoyances, and simple lack of good manners will not create such deterrence." Id.; see also Moore v. City of Philadelphia, 461 F.3d 331, 341 (3d Cir. 2006) (applying this standard).

47

The magistrate judge found that the defendants did not take any materially adverse actions against the plaintiff and therefore did not retaliate against plaintiff. Plaintiff had claimed that evidence of retaliatory action against her included discipline by the defendants, behavior that forced her to use vacation time and e-time, harassment of her doctor, placement on steps of the RAP system, the characterization of absences as new instead of related to her intermittent leave and requirements that she fill out FMLA certifications for an illness she had already claimed.  The magistrate judge found that none of this evidence constituted evidence sufficient to survive a motion for summary judgment.  Many of plaintiff's claims of retaliation were the same as her claims of discrimination and FMLA interference and were thus not retaliatory actions.  The only real discipline cited by the plaintiff, the magistrate judge found, was that of placing plaintiff her on Step 1 of the RAP.  He concluded that such action was simply a warning and did not rise to the level of retaliation, and that the decision to raise plaintiff to Step 1 came not because she had exercised any right, but because of her failure to complete required certifications.  The magistrate judge also concluded that plaintiff had not identified any specific vacation days she used instead of seeking FMLA leave.  In any case, he found, plaintiff's use of vacation days was not a consequence of alleged retaliatory action, but more properly part of a discrimination or interference claim.  Similarly, the conversations between Dr. Miller and Dr. Kovalick did not constitute retaliation because their conversations were about the status of plaintiff's underlying FMLA

request, not a response to that request.  The magistrate judge also found that the paperwork that plaintiff had to fill out for her FMLA claims were likewise related to the original request, not retaliation.  They were a minor bureaucratic annoyance, not a materially adverse condition.

Plaintiff contends that defendants' disciplining of plaintiff by placing her on the RAP program constituted the sort of discipline that would dissuade a plaintiff from complaining about improper treatment under the FMLA.  She again complains that the magistrate judge did not credit evidence she says proves that she had been advanced to Step 2 of the RAP.  She also contends that the magistrate judge erred in not concluding that Verizon had improperly concluded that defendants did not violate plaintiff's rights by disallowing her FMLA claims in March 2003.  She insists that the fault for not obtaining certifications lay with the defendants, not with the plaintiff.  This failure could dissuade a reasonable person "from complaining about FMLA administration/failing to accommodation [sic] since instead of the situation being corrected, the employee actually gets disciplined again."  (Plaintiff's Brief at 34).

We agree with the magistrate judge that the case contains no evidence that demonstrates that defendants undertook a materially adverse action against the plaintiff in connection with her attempt to exercise her rights under the FMLA.  The magistrate judge was correct to conclude that the paperwork that plaintiff was forced to complete to obtain any relief under the FMLA did not constitute the sort of action

that would dissuade a party from exercising their rights, but was instead a typical bureaucratic annoyance that any employee must face.  For the reasons stated in section IV. C and note 24, *supra*, we also conclude that plaintiff was never advanced beyond Step 1 on the RAP.  Plaintiff has submitted no evidence by which we could conclude otherwise.  Since Step 1 on the RAP is only an advisory status, with no material consequences, we agree that such an action–even if we could conclude that defendants took that action in response to plaintiff's assertion of her rights under the FMLA rather than as a consequence of her failure to complete FMLA certifications for her absences–would not be of the kind which would dissuade a reasonable person from attempting to obtain her rights under the statute.

Plaintiff's complaint about defendants' denial of her requests for leave under the FMLA is also not evidence of retaliation.  Instead, such denials provide the grounds for plaintiff's underlying contention that defendants improperly denied her her rights under the FMLA.  Unlike the plaintiff in White, who claimed that her employer retaliated against her by suspending her after she filed a complaint with the Equal Employment Opportunity Commission, plaintiff here contends that her requests for leave and defendants' retaliation coincided. See White, 126 S.Ct. At 2409.  She cannot prove retaliation based on such facts.   We therefore agree with the magistrate judge that summary judgment should be granted the defendants on this claim.

**V.  Conclusion**

We will adopt the magistrate judge's report and recommendation on this matter and grant summary judgment to the defendants on all counts in the plaintiff's complaint.[43]

---

[43]We note that none of the discussion here has focused specifically on Defendant Sparrow.  None of plaintiff's objections focused specifically on the magistrate judge's conclusions regarding Defendant Sparrow, and we could conclude that we need apply only the "clear error or manifest injustice" standard to the claims against her.  Since we conclude that summary judgment is warranted on all claims for all defendants based on a *de novo* standard, we will apply those conclusions equally to all defendants.

## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **TERRI SCONFIENZA,** | : | **No. 3:05cv272** |
| **Plaintiff,** | : | |
| | : | **(Judge Munley)** |
| | : | |
| **v.** | : | |
| | : | |
| **VERIZON PENNSYLVANIA, Inc.,** | : | |
| **d/b/a VERIZON, and** | : | |
| **LESLEE SPARROW,** | : | |
| **Defendants** | : | |

## ORDER

**AND NOW**, to wit, this 23rd day of April 2007:

1) The report and recommendation of Magistrate Judge Malchy E. Mannion

(Doc. 81) is hereby **ADOPTED**;

2) Defendants' Motion for Summary Judgment (Doc. 67) is hereby **GRANTED**;

3) Judgment for the defendants is hereby **GRANTED**; and

4) The Clerk of Court is directed to close the case.


**BY THE COURT:**


**s/ James M. Munley**
**JUDGE JAMES M. MUNLEY**
**United States District Court**